# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | |
|---|---|
| PAMELA GLOVER and CHARLES ELLIS, individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | Civil Action No. |
| vs. | |
| WOODBOLT DISTRIBUTION, LTD., a Texas limited liability company; and DOES 1-50, inclusive, | *Jury Trial Requested* |
| Defendants. | |

## PLAINTIFFS' CLASS ACTION COMPLAINT

## INTRODUCTION

1.      Defendant Woodbolt Distribution, Ltd. ("Woodbolt") is a company which manufactures, distributes, markets, and sells a variety of purported "muscle growth," "weight loss" and "protein" dietary supplements to consumers.  Some of Woodbolt's best selling products are marketed under its "Cellucor" brand, including "C4 Extreme," "M5 Extreme," and "NO N-Zero Extreme" (collectively, the "Products").  These Products are purported dietary supplements which are marketed for use as "pre-workout" energy and muscle building supplements.

2.     C4 Extreme is marketed as a "pre-workout" dietary supplement which provides benefits from "NO3 Pump Technology" and produces "Highly Explosive Energy."  M5 Extreme is marketed as a "pre-workout" dietary supplement which produces "Explosive Energy Ignited by C4," "Muscle Pumps," "Strength & Size" and "Muscle Mass."  However, C4 Extreme and M5 Extreme contain a dangerous stimulant that poses a serious health risk and has potentially life-threatening side effects.  The stimulant, which is supposedly derived from the oil of the geranium plant, is known by many names, including "1, 3 dimethylamylamine," "methylhexanamine," and "geranamine" (hereinafter collectively referred to as "DMAA").

3.     NO N-Zero Extreme is also marketed as a "pre-workout" dietary supplement which produces "Explosive Energy," "Muscle Pumps," "Strength & Definition" and "Muscle Protection."  However, NO N-Zero Extreme contains an ingredient known by many names, including "Carbamyl-L-Glutamate," "Carglumic Acid," and "Carbaglu" (hereinafter referred to as "Carbaglu").  Carbaglu is actually an FDA-approved drug that is used for the treatment of a rare genetic disorder, Hyperammonemia, the use of which may have potentially serious adverse side effects.

4.     Plaintiffs Pamela Glover and Charles Ellis (collectively "Plaintiffs") purchased Woodbolt's Products in reliance on the company's claims that the Products are safe, effective and legal dietary supplements, which the Products are not.  At the time Plaintiffs purchased and used C4 Extreme and M5 Extreme, they were unaware that these Products contained a dangerous stimulant, DMAA, the use of which is banned by several athletic organizations, and sale of which is completely prohibited in certain countries.  In addition, at the time Plaintiffs purchased and used NO N-Zero Extreme, they were unaware the Product contained an FDA-approved drug with potentially dangerous side effects.

5.     DMAA was patented by Eli Lilly & Company in 1944 and later

marketed as a drug, beginning in 1971, under the trademark "Forthane" for use as a nasal decongestant and as a treatment for hypertrophied or hyperplasic oral tissues. DMAA is a vasoconstrictor and central nervous system stimulant which is on the World Anti-Doping Agency ("WADA") and Major League Baseball ("MLB") lists of banned substances.  DMAA is totally banned in Canada and New Zealand. Recently, DMAA has gained popularity with young people as a designer drug used in "party pills."

6.     Woodbolt fails to inform consumers that DMAA is a dangerous central nervous system stimulant which is banned by WADA, MLB, Canada and New Zealand, and that using the Products can cause consumers to test positive for an illegal substance and/or amphetamine use.

7.     In addition, though DMAA is claimed to be an extract of geranium oil, most of the DMAA contained in products currently on the market is wholly "synthetic" DMAA, completely manufactured in laboratories, and is not derived from the geranium plant in any way whatsoever.  In fact, Plaintiffs are informed and believe and on that basis allege that the DMAA in Woodbolt's Products is purely synthetic.  Significantly, recent studies have also concluded that there is no DMAA in geranium oil at all, that DMAA cannot be extracted from geranium oil, and that all DMAA on the market is synthetic.

8.     Furthermore, because DMAA was previously patented and marketed by Ely Lilly as a "drug" for the treatment of various medical conditions and disorders, it cannot now be considered a dietary ingredient which can be properly included in a dietary supplement.

9.     Similarly, Carbaglu is a drug marketed by the Orphan Pharmaceutical Company.  On March 18, 2010, Carbaglu was approved as a drug by the FDA for the treatment of a rare genetic disorder known as Hyperammonemia.  This disorder is caused by the lack of a liver enzyme called N-acetylglutamate synthase, or "NAGS," and results in too much ammonia in the blood.  Carbaglu acts by replacing

the NAGS enzyme and helps reduce the amount of ammonia in the blood. Carbaglu's side effects include infections, vomiting, abdominal pain, pyrexia, tonsillitis, anemia, ear infection, diarrhea, nasopharyngitis, and headaches.  (*See* Ex. 1, Drug information on Carbaglu.)

10.   Nevertheless, the Products are falsely advertised by Woodbolt as safe, natural dietary supplements.  Woodbolt fails to inform consumers that the Products do not meet the definition of a "dietary supplement," and that DMAA and Carbaglu do not meet the definition of a "dietary ingredient."

11.   Recently, the United States Food and Drug Administration ("FDA") issued warnings about over-the-counter sales of various fraudulent and dangerous dietary supplements promoted mainly for bodybuilding, as is the case here.  (*See* Ex. 2, "Tainted Products Marketed as Dietary Supplements;" *see also* Ex. 3, "Beware of Fraudulent Dietary Supplements.")  The FDA notes that such products often "contain hidden or deceptively labeled ingredients," such as active ingredients contained in drugs required to be approved by the FDA prior to marketing, or other compounds that do not qualify as dietary ingredients.  (Ex. 3, p. 1.)

12.   Not content to deceptively market the Products as dietary supplements, Woodbolt goes a step further in its marketing scheme by making false, misleading, and unsubstantiated claims regarding the safety and effectiveness of the Products -- claims that Woodbolt knows are completely without merit or scientific substantiation -- in order to lure unsuspecting consumers into buying these so called "dietary supplements."

13.   Accordingly, Plaintiffs bring this lawsuit, on behalf of themselves and a putative nation-wide class of purchasers of the Products, to enjoin Woodbolt and Does 1-50 (collectively "Defendants") from selling the Products without informing consumers that DMAA is a potentially dangerous, synthetic, banned stimulant, that Carbaglu is an FDA approved drug with potentially dangerous side effects, and from making illegal and deceptive marketing claims regarding the effectiveness and

safety of the Products.  Plaintiffs further seek to recover restitution from Defendants in the amount of the total funds expended by Plaintiffs to purchase the Products, and by a class of all consumers who purchased the Products within four (4) prior to the filing of this Complaint through the present.

14.   In the course of manufacturing, labeling, marketing, distributing, and selling the Products, Defendants, individually and acting as agents, employees, servants or alter egos of each other, have committed and continue to commit the above alleged illicit business practices in direct violation of Texas Deceptive Trade Practices Act ("DTPA") and warranty laws.

15.   Furthermore, Defendants, individually and acting as agents, servants or employees of Woodbolt, have "misbranded" the Products as "dietary supplements."

## THE PARTIES

16.   Plaintiff Pamela Glover is a citizen of the state of California and a resident of Santa Clara County, California who purchased the Products in and around September, 2011 in Santa Clara County, California.

17.   Plaintiff Charles Ellis is a citizen of the state of California and a resident of Alameda County, California who purchased the Products beginning in and around January, 2011 in Contra Costa County and/or Alameda County, California.

18.   Plaintiffs are informed and believe that Woodbolt is a Texas limited liability company doing business in the state of California and throughout the United States.  Woodbolt's principal place of business and headquarters are located at 715 North Main Street, Bryan, TX 77803.

19.   Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1 through 50, inclusive, and therefore sues such Defendants by said fictitious names.  Plaintiffs are informed and believe, and based thereon allege, that each of the Doe Defendants is in some manner legally responsible for the damages suffered by Plaintiffs and the members of the putative class as alleged herein.  Plaintiffs will further amend this Complaint to set forth the

true names and capacities of these Defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

20.   Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, there existed a unity of interest and ownership between and among the Defendants such that any individuality and separateness between and among them have ceased to exist such that each Defendant is the alter ego of each of the other Defendants, and they should not be allowed to evade justice by asserting the corporate or other limited liability veil.

21.   Plaintiffs are informed and believe and based thereon allege that, at all times relevant herein, each of the Defendants was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, or representative of each of the other Defendants, and was acting in such capacity in doing the things herein alleged.

22.   Plaintiffs are informed and believe that, at all relevant times, Defendants were, and still are, aware, or should have been aware, that DMAA is a potentially dangerous, synthetic stimulant banned by several athletic organizations and in certain countries, that Carbaglu is an FDA approved drug, that use of the Products may have serious and medically risky adverse side effects, and that use of the Products does not produce the results promised on the label and/or cannot produce the promised results without serious adverse side effects.  Nevertheless, Defendants market the Products as safe and effective dietary supplements, and fail to inform consumers of the true facts.

23.   In committing the wrongful acts alleged herein, Defendants planned and directly participated in and furthered a common scheme by means of false, misleading and deceptive advertising and labeling representations to induce consumers to purchase the Products.

24.   Defendants aided and abetted and knowingly assisted each other in their wrongful conduct as herein alleged.

## JURISDICTION AND VENUE

25.   This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 and the Class Action Fairness Act ("CAFA").  Plaintiffs and other members of the putative nationwide class are citizens of the United States. Defendant Woodbolt is a Texas limited liability company with its principal place of business in the state of Texas.  Plaintiffs are informed and believe, and based thereon allege, that more than two thirds of members of the putative nationwide class are citizens of a state different than Defendants'.  Plaintiffs are also informed and believe, and based thereon allege, the amount in controversy in this case, exclusive of interests and costs, exceeds $5,000,000.00 and the total number of putative nationwide class members is, at a minimum, in the thousands, if not hundreds of thousands.

26.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1), (a)(2), and (a)(3) and § 1391(c) in that a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this judicial district, and Defendants reside in this judicial district, do substantial business in this judicial district, have received substantial benefit from doing business in this judicial district, and have knowingly engaged in activities directed at consumers in this judicial district.  Furthermore, a significant number of Defendants' customers are Texas residents, and the wrongful acts alleged herein have affected members of the class throughout Texas.  Texas has a significant contact or aggregation of contacts to the claims at issue herein in that Defendants promote, market and sell the Products in Texas.  Defendants are subject to personal jurisdiction anywhere in the state of Texas, including in this judicial district.

27.   Each of the Defendants, individually and acting as agents, servants, officers, directors, employees, managers, controlling principals, shareholders and/or alter egos of Woodbolt, are headquartered and do business in Texas, have sufficient minimum contacts with Texas, and/or otherwise intentionally avail themselves of

the markets in Texas through the promotion, marketing and sale in Texas of the Products, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  In addition, the business activities of Defendants at issue in this Complaint were within the flow of and substantially affected interstate trade and commerce.  There has been a continuous and uninterrupted flow of activities in interstate commerce throughout the class period.

## FACTS COMMON TO ALL CAUSES OF ACTION

28.   Although Defendants have been extremely successful with the marketing, sale and distribution of the Products, their success has been based on false, misleading and deceptive advertising.  Woodbolt sells the Products through a deceptive marketing campaign claiming that the Products are safe dietary supplements which if used by a consumer before a workout will provide an energy boost which will result in increased muscle mass.  Specifically, Woodbolt advertises: that C4 Extreme produces "Highly Explosive Energy," and has "NO3 Pump Technology" (*see* Ex. 4, labeling for C4 Extreme); that M5 Extreme produces "Explosive Energy Ignited by C4" which increases "Muscle Pumps," "Strength & Size" and "Muscle Mass" (*see* Ex. 5, labeling for M5 Extreme); and that NO N-Zero Extreme produces "Explosive Energy" resulting in increased "Muscle Pumps," "Strength & Definition" and "Muscle Protection" (*see* Ex. 6, labeling for NO N-Zero Extreme).

29.   Recent studies have shown that DMAA is not a natural constituent of the geranium plant, and that all DMAA is synthetic.  *See* Ex. 8 (excerpt from Interview with Ed Wyszumiala of NSF International); Ex. 9 ("AHPA: Review of Research Shows DMAA Not Naturally From Geranium").  In fact, NSF International, a world leader in standards development and product certification for over 65 years, and widely recognized for its scientific and technical expertise in product certification, has publicly stated that it has tested geranium oil down to a parts per billion screen,

and DMAA is not derived from natural geranium oil; it is a synthetic compound and not a natural constituent of the botanical geranium.  Furthermore, experts in the industry have been extremely concerned that this potent stimulant drug will lead to serious health issues and even death, as was the case with ephedra before it was banned by the FDA in 2003.  *See* Ex. 10 ("Synthetic Geranium Still Raising Industry Red Flags").

30.   The labeling for C4 Extreme claims that consumption of the Product produces "Highly Explosive Energy."  (*See* Ex. 4.)  The labeling for M5 Extreme claims the Product will produce "Explosive Energy Ignited By C4," and increase "Muscle Pumps," "Strength & Size" and "Muscle Mass."  (*See* Ex. 5.)  The labeling for NO N-Zero Extreme claims the Product will produce "Explosive Energy," increase "Muscle Pumps" and "Strength & Definition," and provide "Muscle Protection."  (*See* Ex. 6.)

31.   All of the Products advertise that they will result in the consumer experiencing benefits from, *inter alia*, a "muscle pump."  In bodybuilding building, a "muscle pump" is a desired physiological effect which results from intense physical exercise that is essentially a tight, blood-congested feeling in a muscle after it has been intensely trained.  It is caused by a rapid influx of blood into the muscle to remove toxins (such as lactic acid and carbon dioxide) and replace such toxins with nutrients and oxygen.  The Products advertise that consumer will experience increased energy, increased muscle strength, increased muscle mass, and/or increased muscle definition.

32.   Moreover, as noted previously, DMAA was patented in 1944 by Eli Lilly and Company (U.S. Patent #2,350,318) and marketed for sale as a drug under the brand name Forthane for the relief of nasal congestion.  *See* Ex. 11 (Patent for DMAA); Ex. 12 (Trademark information regarding Forthane); Ex. 13 (Advertisements by Eli Lilly for the drug Forthane).  DMAA has also been used in combination with other drugs as a treatment for hypertrophied or hyperplastic oral

tissues. *See* Ex. 14 (Patent utilizing DMAA to treat hypertrophied gums).

33. Plaintiffs are informed and believe that the use of DMAA can have extremely dangerous side effects. Significantly, Don Caitlin, preeminent anti-doping scientist, has noted in a Washington Post news article that DMAA has a chemical structure similar to amphetamine and ephedrine, and can cause increases in heart rate and blood pressure, and even death. Caitlin further stated "this substance should not be out there…it's a dangerous material." *See* Ex. 15 (Washington Post Article entitled "Chemist's New Product Contains Hidden Substance"). The safety concerns associated with DMAA have been well-documented, including concerns that DMAA is a dangerous and addictive substance that can cause headache, nausea and stroke. *See* Ex. 16 (excerpt from article entitled "Jack3d and other MHA-containing Supplements Fuel Adulteration, Safety Concerns"). To make things worse, DMAA is widely used as a "designer drug" in dangerous "party pills." *See* Ex. 17 (excerpt from article entitled "New pill ingredient worries ministry").

34. Despite Defendants' knowledge of the dangers associated with DMAA use, they continue to advertise and sell the Products to unknowing consumers as safe, natural dietary supplements. Defendants have failed to warn consumers that DMAA use can potentially cause serious adverse side effects, that DMAA is considered to be a potentially dangerous, performance-enhancing stimulant in the sports world and, as such, is classified as a banned substance by MLB, WADA and the United States Anti-Doping Agency ("USADA"). *See, e.g.,* Ex. 18 (WADA 2011 Prohibited Substances List). Numerous athletes in various sports throughout the world have been suspended or disqualified for unknowingly using products containing DMAA. However, despite having knowledge of these facts, Defendants have never specifically warned consumers that DMAA is actually banned by certain sports organizations, as well as being completely banned in Canada and New Zealand, and could cause users to fail drug tests.

35. Carbaglu is a drug originally developed by the Orphan Pharmaceutical

Company, receiving European marketing authorization in 2003 and approved by the FDA on March 18, 2010, for the treatment of Hyperammonemia, a rare genetic disorder.  Defendants, however, wrongfully market NO N-Zero Extreme as a safe, over-the-counter dietary supplement despite the fact that the product label lists a drug, Carbaglu, as one of its primary ingredients.  *See* Ex. 6.

36.   Plaintiffs are informed and believes that the use of Carbaglu can have extremely dangerous side effects, including infections, vomiting, abdominal pain, pyrexia, tonsillitis, anemia, ear infection, diarrhea, nasopharyngitis, and headache. (*See* Ex. 1.)

37.   Despite Defendants' knowledge of the dangers associated with Carbaglu use, they continue to advertise and sell NO N-Zero Extreme to unknowing consumers as a safe, natural dietary supplement.  Defendants have failed to warn consumers that Carbaglu is a drug, use of which can potentially cause serious adverse side effects.

38.   Defendants not only promise consumers that the Products are safe, they also assure consumers the Products are effective and can produce amazing results. Defendants promise these results knowing that none of the Products, nor any of the Products' individual ingredients at the levels contained therein, can produce these promised results.  Plaintiffs are informed and believe, and on that basis allege, that any existing efficacy studies are on individual ingredients contained within the Products, and none of these studies are on healthy humans with equivalent dosing or routes of administration.  Therefore, such claims are purely false advertising to induce consumers to spend their hard earned money on unproven Products solely for the Defendants' monetary gain.

39.   Following the DMAA-linked deaths of two soldiers from heart attack in 2011, and after recording a number of other serious adverse health effects suffered by known and potential users of products containing DMAA, including kidney and liver failure, seizures, loss of consciousness, heat injury and muscle breakdown

during exertion, and rapid heartbeat, the Army launched a safety investigation of the substance.  As a result, on December 3, 2011, all bodybuilding and weight loss supplements containing DMAA were pulled from the shelves of all Army, Air Force and Navy Exchange Service stores around the world.  *See* Ex. 19 (Article from Stars and Stripes entitled "Army probing connection between body building supplement, 2 deaths," dated December 15, 2011.)

40.   On April 27, 2012, the FDA published a news release stating that the agency had issued warning letters to ten manufacturers and distributors of dietary supplements, containing DMAA, for the companies' failure to provide the FDA with evidence of the safety of their products.  *See* Ex. 20 (FDA News Release titled "FDA Challenges Marketing of DMAA Products for Lack of Safety Evidence"). The FDA warning letters advised the companies that the agency is not aware of evidence or history of use to indicate that DMAA is safe.  The FDA also warned the companies that synthetically-produced DMAA is not a "dietary ingredient" and, therefore, is ineligible to be used as an active ingredient in a dietary supplement. *See. e.g.,* Ex. 21 (FDA DMAA Warning Letter to Nutrex Research, Inc. dated April 24, 2012.)

41.   Despite knowing C4 Extreme and M5 Extreme contain DMAA, a synthetic, banned and potentially dangerous stimulant, that NO N-Zero Extreme contains Carbaglu, an FDA approved drug with potentially dangerous side effects, and that the Products are ineffective for their intended use, Defendants continue to, among other things:

> (a)   Fail to warn consumers about the extreme health dangers and potential side effects of the Products;
>
> (b)   Knowingly withhold from consumers material information regarding the DMAA contained in the C4 Extreme and M5 Extreme, including but not limited to the fact that DMAA is banned by WADA, USADA and MLB, and banned completely

in Canada and New Zealand;

(c)    Knowingly withhold from consumers material information regarding the Carbaglu contained in NO N-Zero Extreme, including but not limited to the fact that Carbaglu is an FDA approved drug; and,

(f)    Falsely advertise the Products as having specific muscle-building properties that the Products do not have.

42.   The labeling for the Products displays the disclaimer that the statements made on the labeling "have not been evaluated by the Food and Drug Administration." In this action, Plaintiffs do not sue to subject Defendants to the FDA pre-market approval or post-market regulatory processes, but rather, to stop the false, deceptive, and often illegal labeling and advertising of the Products under Texas law as described herein.

<strong><u>PLAINTIFFS' EXPERIENCES WITH THE PRODUCTS</u></strong>

43.   In and around September of 2011, Plaintiff Pamela Glover purchased C4 Extreme, M5 Extreme, and NO N-Zero Extreme from a GNC store in Santa Clara County, California. Prior to purchasing these three Products, Plaintiff Glover reviewed the product packaging and read the labeling statements which claim, among other things, that: (1) each of the Products is a "dietary supplement;" (2) C4 Extreme will produce "Highly Explosive Energy" and has "NO3 Pump Technology;" (3) M5 Extreme will produce "Explosive Energy Ignited By C4," "Muscle Pumps," "Strength & Size" and "Muscle Mass;" and, (4) NO N-Zero Extreme will produce "Explosive Energy," "Muscle Pumps," "Strength & Definition," and "Muscle Protection."

44.   At the time Plaintiff Glover purchased C4 Extreme and M5 Extreme, she was not aware, and the Product packaging did not inform her, that: (1) DMAA is a potentially dangerous, synthetic stimulant banned by WADA, USADA and MLB; (2) DMAA is banned totally in Canada and New Zealand; (3) DMAA was once

marketed as the drug Forthane; (4) using DMAA can cause serious side effects; (5) the labeling for C4 Extreme and M5 Extreme makes claims without adequate scientific substantiation or adequate labeling explanation; and (6) using DMAA could cause her to test positive for a banned substance or for use of amphetamines.

45.    Similarly, at the time Plaintiff Glover purchased NO N-Zero Extreme, she was not aware, and the Product packaging did not inform her, that: (1) Carbaglu is an FDA approved drug used for the treatment of Hyperammonemia; (2) use of Products containing Carbaglu can cause serious side effects; and (3) the labeling for NO N-Zero Extreme makes claims without adequate scientific substantiation or adequate labeling explanation.

46.    Plaintiff Glover used the Products without knowing any of the aforementioned facts.  In purchasing the Products, Plaintiff Glover relied on the representations made by Defendants on the labeling and packaging for the Products. Plaintiff Glover reasonably believed and relied on Defendants' representations that the Products are safe and effective dietary supplements which can be legally sold over-the-counter.  Plaintiff Glover used the Products in accordance with the labeling instructions.  She used the Products as directed for weeks, but did not experience "Highly Explosive Energy," "Muscle Pumps," "Strength & Size," "Strength & Definition," "Muscle Mass," or "Muscle Protection."  However, Plaintiff Glover did experience severe adverse side effects, including feeling jittery and anxious and having persistent headaches.  Given these serious side effects, the Products did not work for Plaintiff Glover as she expected, nor as promised by Defendants' labeling representations.

47.    Furthermore, Plaintiff Glover would have never purchased or used the Products had she known the Products are not safe, natural and effective dietary supplements as they are advertised to be, but in fact are ineffective and contain DMAA, a banned and extremely dangerous synthetic pharmaceutical substance, or Carbaglu, an FDA approved drug used for the treatment of Hyperammonemia.

Plaintiff Glover has suffered injury in the amount of money she spent to purchase the Products.

48.   In or around January, 2011, Plaintiff Charles Ellis purchased one 390g container of C4 Extreme from a local GNC store in Contra Costa County.  In or around March 2011, Plaintiff Ellis purchased one 712g container of M5 Extreme from the same GNC store.  In or around May 2011, Plaintiff Ellis purchased one 277g container of NO N-Zero Extreme from a local GNC store.  Prior to purchasing these three Products, Plaintiff Ellis reviewed the product packaging and read the labeling statements which claim that: (1) each of the Products is a "dietary supplement;" (2) C4 Extreme will produce "Highly Explosive Energy" and has "NO3 Pump Technology;" (3) M5 Extreme will produce "Explosive Energy Ignited By C4," "Muscle Pumps," "Strength & Size" and "Muscle Mass;" and, (4) NO N-Zero Extreme will produce "Explosive Energy," "Muscle Pumps," "Strength & Definition," and "Muscle Protection."

49.   At the time Plaintiff Ellis purchased C4 Extreme and M5 Extreme, he was not aware, and the Product packaging did not inform him, that: (1) DMAA is a potentially dangerous, synthetic stimulant banned by WADA, USADA and MLB; (2) DMAA is banned totally in Canada and New Zealand; (3) DMAA was once marketed as the drug Forthane; (4) using DMAA can cause serious side effects; (5) the labeling for C4 Extreme and M5 Extreme makes claims without adequate scientific substantiation or adequate labeling explanation; and (6) using DMAA could cause him to test positive for a banned substance or for use of amphetamines.

50.   Similarly, at the time Plaintiff Ellis purchased NO N-Zero Extreme, he was not aware, and the Product packaging did not inform him, that: (1) Carbaglu is an FDA approved drug used for the treatment of Hyperammonemia; (2) use of Products containing Carbaglu can cause serious side effects; and (3) the labeling for NO N-Zero Extreme makes claims without adequate scientific substantiation or adequate labeling explanation.  Plaintiff Ellis used the Products without knowing

any of the aforementioned facts.

51.   In purchasing the Products, Plaintiff Ellis relied on the representations made by Defendants on the labeling and packaging for the Products.  Plaintiff Elis reasonably believed and relied on Defendants' representations that the Products are safe and effective dietary supplements which can be legally sold over-the-counter. Plaintiff Ellis used the Products in accordance with the labeling instructions.  He used the Products as directed for approximately five (5) months but did not experience the promised "Highly Explosive Energy," "Muscle Pumps," "Strength & Size," "Strength & Definition," "Muscle Mass," or "Muscle Protection."  However, Plaintiff Ellis did experience severe adverse side effects, including extreme anxiety, persistent cold and flu symptoms, and nausea.  Given these serious side effects, the Products did not work for Plaintiff Ellis as he expected, nor as promised by Defendants' labeling representations.

52.   Furthermore, Plaintiff Ellis would have never purchased or used the Products had he known the Products are not safe, natural and effective dietary supplements as they are advertised to be, but in fact are ineffective and contain DMAA, a banned and extremely dangerous synthetic stimulant, or Carbaglu, an FDA approved drug used for the treatment of Hyperammonemia.  Plaintiff Ellis has suffered injury in the amount of the money he spent to purchase the Products.

## CLASS ACTION ALLEGATIONS

53.   Plaintiffs bring this class action for injunctive relief, restitution and other equitable and monetary relief on behalf of the putative class (the "Class") consisting of:

> **All persons residing in the United States who purchased the Products for personal use within four years prior to the date the Complaint in this action was filed through the present (the "Class Period").**

54.   Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers,

directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

55.    The proposed Class is so numerous that individual joinder of all its members is impracticable.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the total number of Class members is, at a minimum, in the hundreds.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.  The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

56.    There is a well-defined community of interest in the questions of law and fact underlying the claims of each member of the Class, and these common questions predominate over any questions that may affect individual Class members. The Common questions of fact and law include, but are not limited to, the following:

(a)    Whether Defendants fail to disclose to consumers that DMAA is a potentially dangerous stimulant which is banned by several sports organizations, including MLB, WADA and USADA, and completely banned in Canada and New Zealand;

(b)    Whether Defendants fail to disclose to consumers the potential adverse side effects associated with using Products containing DMAA and Carbaglu;

(c)    Whether Defendants fail to disclose to consumers the potential adverse side effects associated with using Products containing Carbaglu;

(d)    Whether Defendants fail to disclose to consumers that DMAA was previously sold as the drug Forthane;

(e)     Whether Defendants fail to disclose to consumers that Carbaglu is an FDA approved drug used for the treatment of Hyperammonemia;

(f)     Whether Defendants fail to disclose to consumers that the labeling for the Products contains structure/function claims which are not adequately explained and for which Defendants do not have adequate scientific substantiation;

(g)     Whether Defendants make false, misleading, deceptive and/or illegal safety and efficacy omissions and representations on the Product labeling;

(h)     Whether the Product claims and omissions herein alleged are false, misleading, deceptive, illegal, material and/or reasonably likely to deceive consumers;

(i)     Whether Defendants' conduct is fraudulent and/or violates public policy;

(j)     Whether Defendants have engaged in unfair, unlawful and/or fraudulent business practices in labeling, advertising, marketing and distributing the Products;

(k)     Whether Defendants engaged in conduct in violation of the DTPA;

(l)     Whether Defendants knowingly concealed material facts for the purpose of inducing unwary consumers into spending money on the Products;

(m)     Whether Defendants' representations, concealments and non-disclosures concerning the Products are likely to deceive consumers;

(n)     Whether Defendants' labeling for the Products is false, misleading, illegal and/or deceptive;

(o)   Whether Defendant represent that the Products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(5);

(p)   Whether Defendants knew or should have known that the Products do not have the sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities for which Defendants advertised and/or labeled the Products;

(q)   Whether Defendants represent that the Products are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(7);

(r)   Whether Defendants knew or should have known that the Products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when in fact, they are of another;

(s)   Whether Defendants advertise the Products with intent not to sell them as advertised, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(9);

(t)   Whether Defendants continued to sell the Products after knowing the preceding facts;

(u)   Whether Defendants breached express and implied warranties as a result of their misrepresentations in selling the Products;

(v)   Whether Defendants have been unjustly enriched;

(w)   The nature and extent of damages and other remedies to which the conduct of Defendants entitle the members of the Class, and/or which should be assessed against Defendants.

(x)    Whether Plaintiffs and the Class are entitled to injunctive relief; and,

(y)    Whether Plaintiffs and the Class are entitled to restitution.

57.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have been similarly affected by Defendants' common course of conduct since they were exposed to the omissions and misrepresentations in the labeling for the Products, and those omissions and misrepresentations were material to their decision to purchase the Products.

58.    Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they are typical purchasers of the Products.  Plaintiffs have retained counsel with substantial experience in handling complex class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class.  Plaintiffs have retained a firm which is widely recognized as among the most successful and effective class action litigation firms in California.

59.    Plaintiffs and the members of the Class have suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the class is impracticable.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties and the court system to resolve the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and efficient handling of all Class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.  Furthermore, for many, if not most, a class action is the only feasible mechanism that allows an

opportunity for legal redress and justice.

60.   Adjudication of individual Class members' claims with respect to the Defendants would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, and could substantially impair or impede the ability of other class members to protect their interests

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES ACT

### (Texas Bus. & Comm. Code §§ 17.41 though 17.63)

61.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

62.   The Products are "goods" within the meaning of Tex. Bus. & Comm. Code § 17.45(1).

63.   Defendants are "persons" within the meaning of Tex. Bus. & Comm. Code § 17.45(3).

64.   Putative class members are "consumers" within the meaning of Tex. Bus. & Comm. Code § 17.45(4).

65.   Plaintiff's and each and every class member's purchases of the Products constitute trade and commerce within the meaning of Tex. Bus. & Comm. Code § 17.45(6).

66.   The policies, acts, and practices heretofore described were intended to result in the sale of the Products to the consuming public, particularly consumers seeking increased energy for workouts and to rapidly build muscle mass and strength.

67.   These actions violated, and continue to violate, the DTPA in the following ways:

      a.   Failing to disclose material facts concerning the Products to the

consuming public.

b.  representing that the Products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(5).

c.  representing that the Products are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(7).

d.  advertising the Products with intent not to sell them as advertised, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(9).

68.    Despite of its superior knowledge and awareness of the true facts concerning the efficacy and safety of the Products and of DMAA, Defendants intentionally withheld, and continues to withhold, such knowledge from putative class members to boost business profits and/or to reap unconscionable unjust enrichment to itself.  This conduct was and is willful, malicious and oppressive, and in conscious disregard of the rights of Plaintiffs and the Class.

69.    Defendants intentionally engaged in this conduct.

70.    Prior to the filing of this action, Plaintiffs purchased the Products for their personal use.  In so doing, they reviewed, believed, and relied upon the marketing omissions and claims on the Product packaging.  The Plaintiffs consumed the Products as directed, but the Products did not work as advertised.  Plaintiffs never would have purchased the Products had they known that the advertised benefits were completely fictitious and that the Products contain a synthetic, dangerous, and banned stimulant, or an FDA approved drug used for the treatment of Hyperammonemia.  Unaware of these facts, Plaintiffs purchased the Products and consumed the Products as directed, but they did not experience the advertised benefits.  Moreover, they experienced serious and severe side effects from use of the Products.

71.   Defendants' practices, omissions, acts and course of conduct in connection with their promotion and sale of the Products, as described hereinabove, are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment.  Like Plaintiffs, members of the putative Class would not have purchased the Products if Defendants had disclosed the truth and all facts concerning the Products..

72.   Plaintiffs and members of the putative Class have been directly and proximately injured by the conduct of Defendants, and such injury includes payment for the Products.

73.   Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the DTPA since Defendants are still falsely representing that the Products have characteristics, benefits and uses which they do not have, continue to fail to disclose the true characteristics and qualities of the Products, and thereby have injured and continue to injure Plaintiffs and the putative Class.

74.   As a direct and proximate result of Defendants' violations of law, Plaintiffs and the Putative Class have been injured.  Prior to filing suit, Plaintiffs' counsel mailed to Defendants, by certified mail, return receipt requested, written notice on behalf of both Plaintiff Pamela Glover and Plaintiff Charles Ellis, as required by Tex. Bus. & Comm Code § 17.505.  The Notice demanded that within sixty (60) days from receipt, Defendants, *inter alia*, adequately correct, repair, replace or otherwise rectify the deceptive practices described in this Complaint for the entire Class, pursuant to Tex. Bus. & Comm. Code § 17.505.  The Notice further demanded that Defendants provide notice and full compensation to consumers who have purchased the Products.  Defendants did not respond to Plaintiffs' notice and demand letter, and failed to meet Plaintiffs' demands.

75.   Plaintiffs and the Class seek an order of this Court enjoining Defendants from continuing to engage in unlawful, unfair, or deceptive business practices and

any other omission or act prohibited by law, including those set forth in this Complaint.  Plaintiffs and the Class also seek an order: (i) enjoining Defendants from failing and refusing to make full restitution of all moneys wrongfully obtained as a result of their violations of the DTPA; (ii) compelling Defendants to disgorge all ill-gotten revenues and/or profits earned or retained as a result of their violations of the DTPA; and (iii) for attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**

**BREACH OF IMPLIED WARRANTY**

**(Tex. Bus. & Comm. Code §§ 2.314-2.315)**

76.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

77.    The Products were sold with the implied warranty of merchantability in that the Products would pass without objection in the trade, are fit for the ordinary purpose for which they are sold and used, are adequately contained, packaged, and labeled, and conform to the promises or affirmations of fact made on the packaging and labeling.  Defendants' Products do not meet the foregoing criteria.

78.    The defects in the Products existed prior to the delivery of the Products to Plaintiffs and putative Class members.  Plaintiffs provided Defendants with notice of their warranty claims, on behalf of themselves and putative Class members, by virtue of notice letters sent to Defendants on March 1, 2012.  Defendants have failed to fulfill their warranty obligations despite said notices.  Plaintiffs and putative Class members have incurred damages as described herein as a direct and proximate result of the defective Products and Defendants' breach of the implied warranty of merchantability, in that Plaintiffs and the putative Class have paid the purchase price for the defective Products.  Plaintiffs, on behalf of themselves and putative Class members, have requested that Defendants correct the defects and Defendants have failed to do so.  Plaintiffs and putative Class members are entitled to refund of the purchase price paid for the Products, consequential and incidental damages, costs

and expenses, including attorney's fees.

## THIRD CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY
### (Tex. Bus. & Comm. Code § 2.313)

79.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

80.   The Products were sold with an express warranty, as Defendants made express affirmations of fact and promises that the Products are dietary supplements containing proper dietary ingredients, and regarding the nature, safety and efficacy of the Products.

81.   The Products were sold with an express warranty because Defendants' descriptions of the Products on the labeling and packaging were intended to become part of the basis of the bargain.  The Products are not suitable for the purpose for which they were required and sold as the Products are not in fact safe and effective, and do not fall within the definition of a "dietary supplement."

82.   The defects in the Products existed prior to the delivery of the Products to Plaintiffs and the putative Class members.

83.   Plaintiffs, on behalf of themselves and putative Class members, provided Defendants with notice of their warranty claims by virtue of the letter sent to Defendants.  Defendants failed to fulfill their warranty obligations despite said notice.

84.   Plaintiffs and putative Class members have incurred damages as described herein as a direct and proximate result of the defective Products and Defendants' breach of the express warranties, in that Plaintiffs and members of the putative Class have paid the purchase price for the defective Products.  Plaintiffs, on behalf of themselves and putative Class members, requested that Defendants correct the defect and refund amounts paid for the defective Products, and Defendants have failed to do so.  Plaintiffs and putative Class members are entitled to refund of the

purchase price of the Products, consequential and incidental damages, and costs and expenses, including attorney's fees.

## FOURTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT/RESTITUTION

85.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

86.   This cause of action is being asserted on behalf of Plaintiffs and putative Class members who purchased Products within the applicable statute of limitations period.

87.   Defendants have benefited from, and have been unjustly enriched by, their wrongful conduct as alleged hereinabove.  Defendants sold the Products to Plaintiffs and members of the putative Class based upon deceptive conduct, omissions and misrepresentations as to uses and qualities which the Products do not possess, and which Defendants were, and still are, aware the Products do not possess.

88.   Defendants have knowledge of this benefit, and have voluntarily accepted and retained this benefit.

89.   The circumstances as described herein are such that it would be inequitable for Defendants to retain these ill-gotten benefits without paying the value thereof to Plaintiffs and putative Class members.

90.   Plaintiffs and putative Class members are entitled to restitutionary disgorgement of the amount of Defendants' ill-gotten gains, including interest, resulting from Defendants' unlawful, unjust and inequitable conduct as described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other persons

similarly situated, pray for judgment against Defendants, as follows:

1.      An Order certifying the proposed Class as defined hereinabove, and any appropriate sub-class(es) thereof, and appointing Plaintiffs and their attorneys to represent the certified Class, with notice thereto to be paid by Defendants;

2.      An award of general damages according to proof;

3.      An award of special damages according to proof;

4.      An award of restitution in an amount according to proof;

5.      Restitutionary disgorgement in an amount according to proof;

6.      For a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining Defendants, and their agents, servants, employees and all persons acting under or in concert with them, to cease and desist from the following acts:

(a)     Selling, marketing or advertising C4 Extreme and M5 Extreme without disclosing to consumers that DMAA is a dangerous, synthetic stimulant, the use of which could potentially have serious adverse side effects;

(b)     Selling, marketing or advertising NO N-Zero Extreme without disclosing to consumers that Carbaglu is a drug approved by the FDA for use as a treatment for Hyperammonemia, the use of which could potentially have serious adverse side effects;

(c)     Selling, marketing or advertising C4 Extreme and M5 Extreme without disclosing to consumers that DMAA is banned by certain athletic organizations and in certain countries;

(d)     Selling, marketing or advertising NO N-Zero Extreme without disclosing to consumers that Carbaglu does not fall within the definition of a "dietary ingredient," and NO N-Zero Extreme does not fall within the definition of a "dietary supplement;"

(e)    Selling, marketing or advertising C4 Extreme and M5 Extreme without disclosing to consumers that DMAA was previously marketed as the drug Forthane;

(f)    Selling, marketing or advertising the Products without disclosing to consumers that Defendants do not have adequate scientific substantiation for the structure/function claims made on the Product labeling;

(g)    Selling, marketing or advertising the Products without adequately explaining the structure/function claims made on Product labeling, and the effect of each nutrient and/or ingredient contained in the Products on the structure or function of the human body;

(h)    Selling, marketing or advertising the Products with any representation or suggestion that consumption of the Products will safely and effectively generate energy or enhance physical exercise, increase muscle mass, strength or definition, or provide protection from muscle injury, without having adequate and reliable scientific substantiation for such claims;

(i)    Engaging in any of the fraudulent, unlawful, unfair, misleading and/or deceptive omissions or conduct described herein; and,

(j)    Engaging in any other omissions or conduct found by the Court to be fraudulent, unlawful, unfair, misleading and/or deceptive;

7.    For pre-judgment interest from the date of filing this suit;

8.    For costs of the proceedings herein;

9.    For reasonable attorneys' fees; and

10.    Any and all such other and further relief that the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial of any claims, causes of action or issues in this action so triable.


DATED: July 20, 2012


By:  /s/ Baxter W. Banowsky

Baxter W. Banowsky
Attorney in Charge
Strate Bar No. 00783593
Southern District Bar No. 15345

**BANOWSKY & LEVINE, P.C.**
12801 N. Central Expressway
Suite 1700
Dallas, Texas 75243
(214) 871-1300
(214) 871-0038 (facsimile)

Attorneys for Plaintiffs