# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

PAMELA GLOVER and CHARLES ELLIS,
individually, and on behalf of all others
similarly situated,

        Plaintiffs,

vs.

WOODBOLT DISTRIBUTION, LTD.,
a Texas limited liability company; and DOES
1-50, inclusive,

        Defendants.

Civil Action No. 4:12-cv-02191

**MEMORANDUM OF LAW IN
SUPPORT OF THE PARTIES
JOINT MOTION FOR
PRELIMINARY APPROVAL OF
PROPOSED CLASS ACTION
SETTLEMENT**

<u>**Telephonic Hearing**</u>
**Date: Nov. 2, 2012**
**Time: 1:00 p.m.**

**TABLE OF CONTENTS**

                                                                                    **Page**

PRELIMINARY STATEMENT ................................................................................ 1

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

    A.    C4 EXTREME, M5 EXTREME, AND N0 EXTREME ........................... 3

    B.    THE LITIGATION ............................................................................... 5

        1.    Procedural History ................................................................. 5

        2.    The Parties' Contentions ...................................................... 6

        3.    Independent Fact Investigation ............................................. 7

    C.    THE PROPOSED SETTLEMENT ...................................................... 8

        1.    Settlement Negotiations ........................................................ 8

        2.    Summary of Proposed Settlement Terms .............................. 8

        3.    Proposed Claims Process for Distribution of Reimbursement
            Payments ............................................................................ 10

        4.    What Is Being Released ....................................................... 11

        5.    Termination ......................................................................... 11

        6.    The Notice and Claims Administration Program .................... 12

ARGUMENT ........................................................................................................ 12

I.    THE PROPOSED SETTLEMENT SHOULD BE PRELIMINARILY
    APPROVED ................................................................................................ 12

    A.    The Standard for Preliminary Approval ........................................ 12

    B.    The Proposed Settlement Meets the Standard for Preliminary Approval ........... 15

        1.    The Settlement Was Negotiated at Arm's Length By Experienced
            Counsel .............................................................................. 15

        2.    The Settlement Has No "Glaring Deficiencies" and Is Appropriate
            for Preliminary Approval ..................................................... 16

        3.    The Proposed Notice Plan Satisfies Rule 23 and Due Process ................ 18

    C.    The Proposed Settlement Class Meets the Prerequisites for Class
    Certification under Rule 23 ........................................................... 20

        1.    Numerosity .......................................................................... 20

        2.    Commonality ....................................................................... 21

        3.    Typicality ............................................................................ 22

        4.    Adequacy ............................................................................ 23

<table>
<tr><td></td><td>5.</td><td>In Addition, the Requirements of Rule 23(b)(3) Are Satisfied</td><td>25</td></tr>
</table>

II.     THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, MERITING PRELIMINARY APPROVAL .......................................................................... 27

    A.     The Preliminary Fairness Determination .......................................... 27

    B.     The Parker Factors ............................................................................ 28

          1.     The Settlement Was Not a Product of Fraud or Collusion ...................... 28

          2.     Complexity, Expense, and Likely Duration of the Litigation.................. 29

          3.     The Stage of the Proceedings and Discovery Completed Support Approval of the Settlement ...................................................... 30

          4.     The Factual and Legal Obstacles of Prevailing on the Merits Favor Settlement ..................................................................... 31

          5.     The Range of Recovery and the Certainty of Damages Favor Settlement ..................................................................... 32

          6.     The Respective Opinions of the Participants Favor Preliminary Approval of the Settlement ...................................................... 34

    C.     The Requested Attorneys' Fee Award and Compensation to the Class Representatives Are Fair And Reasonable .......................................... 34

    D.     The Proposed Schedule of Events.................................................... 35

CONCLUSION.............................................................................................. 36

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)..............................................................................................24, 25, 27

*Ayers v. Thompson,*
358 F.3d 356 (5th Cir. 2004) ........................................................................................29, 30

*Batchelder v. Kerr-McGee Corp.,*
246 F. Supp. 2d 525 (N.D. Miss. 2003) ........................................................................29, 35

*Boeing Co. v. Van Gemert,*
444 U.S. 472 (1980)............................................................................................................34

*Cotton v. Hinton,*
559 F.2d 1326 (5th Cir. 1977) ...................................................................................13, 28

*DeHoyos v. Allstate Corp.,*
240 F.R.D. 269 (W.D. Tex. 2007) ....................................................................................32

*Forbush v. J.C. Penney Co., Inc.,*
994 F.2d 1101 (5th Cir. 1993) ..........................................................................................21

*Garza v. Sporting Goods Properties, Inc.,*
1996 WL 56247 (W.D. Tex. Feb. 6, 1996)........................................................................32

*Hoge v. Parkway Chevrolet, Inc.,*
2007 WL 3125298 (S.D.Tex. Oct.23, 2007)....................................................................19

*In re Chicken Antitrust Litig. Am. Poultry,*
669 F.2d 228 (5th Cir. 1982) ............................................................................................13

*In re Cooper Companies Inc. Sec. Litig.,*
254 F.R.D. 628 (C.D. Cal. 2009)......................................................................................26

*In re Elec. Data Sys. Corp. Sec. Litig.,*
226 F.R.D. 559 (E.D. Tex. 2005) aff'd sub nom. Feder v. Elec. Data Sys. Corp., 429
F.3d 125 (5th Cir. 2005) ..............................................................................................21, 22

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,*
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ..................................................................24, 25, 31

*In re Lease Oil Antitrust Litig. (No. II),*
186 F.R.D. 403 (S.D. Tex. 1999)......................................................................................26

*In re OCA, Inc. Sec. & Derivative Litig.,*
2008 WL 4681369 (E.D. La. Oct. 17, 2008) ..............................................................13, 28

*In re Seitel, Inc. Sec. Litig.,*
245 F.R.D. 263 (S.D. Tex. 2007)......................................................................................20

*In re Shell Oil Refinery,*
155 F.R.D. 552 (E.D. La. 1993)........................................................................................32

*James v. City of Dallas, Tex.*,
   254 F.3d 551 (5th Cir. 2001) ...................................................................................22

*Jenkins v. Raymark Indus.*,
   782 F.2d 468 (5th Cir. 1986) ..................................................................................21

*Klein v. O'Neal, Inc.*,
   2009 WL 1174638 (N.D. Tex. Apr. 29, 2009) .......................................................19

*Langbecker v. Elec. Data Sys. Corp.*,
   476 F.3d 299 (5th Cir. 2007) ..................................................................................24

*Lightbourn v. County of El Paso*,
   118 F.3d 421 (5th Cir.1997) ...................................................................................21

*McNamara v. Bre-X Minerals Ltd.*,
   214 F.R.D. 424 (E.D. Tex. 2002)......................................................................14, 16

*Miller v. Republic Nat. Life Ins. Co.*,
   559 F.2d 426 (5th Cir. 1977) ..................................................................................13

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950).........................................................................................18, 19

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) ..................................................................................22

*Murillo v. Texas A & M Univ. Sys.*,
   921 F. Supp. 443 (S.D. Tex. 1996) ....................................................13, 14, 15, 28

*Parker v. Anderson*,
   667 F.2d 1204 (5th Cir. 1982) ........................................................................ passim

*Ramsey v. Arata*,
   406 F. Supp. 435 (N.D. Tex. 1975) ........................................................................25

*Reed v. Gen. Motors Corp.*,
   703 F.2d 170 (5th Cir. 1983) ..................................................................................31

*Republic Nat. Bank of Dallas v. Denton & Anderson Co.*,
   68 F.R.D. 208 (N.D. Tex. 1975) .......................................................................25, 26

*Rubenstein v. Republic Nat. Life Ins. Co.*,
   74 F.R.D. 337 (N.D. Tex. 1976) .............................................................................17

*Schwartz v. TXU Corp.*,
   2005 WL 3148350 (N.D. Tex., Nov. 8, 2005)...................................................23, 35

*Smith v. Tower Loan of Mississippi, Inc.*,
   216 F.R.D. 338 (S.D. Miss. 2003) *aff'd sub nom. Smith v. Crystian*, 91 F. App'x 952
   (5th Cir. 2004)..........................................................................................................29

*Stewart v. Winter*,
   669 F.2d 328 (5th Cir. 1982) ..................................................................................21

*Stoffels v. SBC Communications, Inc.,*
238 F.R.D. 446 (W.D. Tex. 2006) ........................................................................23

*Zeidman v. J. Ray McDermott & Co., Inc.,*
651 F.2d 1030 (5th Cir. 1981) ......................................................................20, 21

**STATUTES**

Texas Business and Commerce Code § 17.5051(a)...................................................6

**OTHER AUTHORITIES**

5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.24[4] (3d ed. 2000) ........................22

MANUAL FOR COMPLEX LITIGATION, Fourth, § 21.63 (Fed. Jud. Ctr. 2004) ...................13

MANUAL FOR COMPLEX LITIGATION, Fourth, § 21.633 (Fed. Jud. Ctr. 2004) .................20

**RULES**

FED. R. CIV. P. 23 ...............................................................................18, 19, 20, 21

FED. R. CIV. P. 23(a) ......................................................................................20, 25

FED. R. CIV. P. 23(a)(1) ........................................................................................20

FED. R. CIV. P. 23(a)(2) ..................................................................................21, 22

FED. R. CIV. P. 23(a)(3) ........................................................................................22

FED. R. CIV. P. 23(a)(4) ..................................................................................23, 25

FED. R. CIV. P. 23(b) ............................................................................................20

FED. R. CIV. P. 23(b)(1) ........................................................................................25

FED. R. CIV. P. 23(b)(2) ........................................................................................25

FED. R. CIV. P. 23(b)(3) ..................................................................................25, 26

FED. R. CIV. P. 23(e) ...........................................................................1, 12, 13, 27

Rule 12(b)(6)..........................................................................................................3

# PRELIMINARY STATEMENT

Plaintiffs Pamela Glover and Charles Ellis ("Plaintiffs" or "Class Representatives") and defendant Woodbolt Distribution, LLC[1] ("Woodbolt" or "Defendant") (collectively, the "Parties") respectfully submit this memorandum in support of their Joint Motion for Preliminary Approval of Proposed Class Action Settlement (the "Motion") in the above-captioned putative class action pursuant to Rule 23(e). Specifically, the Motion seeks entry of the [Proposed] Order Preliminarily Approving Class Action Settlement ("Preliminary Approval Order"), submitted herewith. The proposed Preliminary Approval Order will, among other things: (i) grant preliminary approval of the proposed class action settlement on the terms set forth in the Settlement Agreement dated November 1, 2012 (the "Settlement")[2]; (ii) certify the Settlement Class for settlement purposes only; (iii) approve the form and manner of giving notice of the proposed Settlement to the Settlement Class; (iv) preliminarily approve Class Counsel; (v) preliminarily approve Class Representatives; and (vi) schedule a Fairness Hearing.

# INTRODUCTION

This Motion seeks preliminary approval of a Settlement of a putative class action involving alleged consumer fraud and false advertising claims relating to three dietary supplement products at issue, C4 Extreme, M5 Extreme, and N0 (N-Zero) Extreme (the "Products").[3] The proposed Settlement provides Settlement Class Members with their choice of either (i) a cash reimbursement payment of $8.00 (up to a $400,000 limit) or (ii) a savings

---

[1] Woodbolt Distribution, LLC was erroneously sued as "Woodbolt Distribution, Ltd."

[2] All capitalized terms that are not defined herein are defined in the parties' Settlement Agreement, which is submitted herewith as Exhibit A to the Declaration of Adrianne E. Marshack ("Marshack Decl.").

[3] As discussed below, the Parties stipulate to certification of a class for settlement purposes only. The parties agree that the settlement class shall include all residents of the United States who purchased the Products after July 20, 2008. Excluded from the Class are any persons or entities who exclude themselves by filing a valid request for exclusion in accordance with the requirements set forth in the Class Notice (the "Settlement Class").

voucher entitling Settlement Class Members to one free item sold on www.cellucor.com when the Settlement Class Member purchases the identical item on said website (i.e. buy one get one free) (with a total potential value of over $42 million on a class-wide basis). These Settlement benefits – cash payments and/or savings vouchers – are to be provided for the immediate benefit of the Settlement Class, to resolve the claims against defendant Woodbolt. In addition, the proposed Settlement also provides for considerable injunctive relief in the form of prohibitions for three years on the inclusion of certain ingredients in the Products to address the concerns enumerated in Plaintiffs' complaint. The Settlement was reached after extensive factual and legal investigation and ample negotiations, which included two mediations.

Class Counsel's investigation in this matter began in July 2011, approximately eight (8) months prior to the March 2012 filing of the complaint in a California lawsuit which preceded the filing of the instant lawsuit, and which was voluntarily dismissed without prejudice in order to avoid a venue dispute and to facilitate ongoing settlement negotiations.[4] The Parties exchanged documents, and Class Counsel thoroughly reviewed scientific and clinical studies and reports relating to certain ingredients included in the Products: 1, 3 Dimethylamylamine ("DMAA") and N-Carbamylglutamate ("NCG"), as well as advertising and marketing materials, and sales data for the Products. Class Counsel investigated the use of DMAA in similar products, reviewed evaluations of DMAA by various sports organizations and the federal Food& Drug Administration ("FDA"), and thoroughly reviewed and analyzed the laws governing the marketing and sale of dietary supplements set forth in the federal Food, Drug & Cosmetics Act ("FDCA") and implementing regulations promulgated by the FDA. Class Counsel also

---

[4] On March 7, 2012, Plaintiffs filed the case captioned *Pamela Glover and Charles Ellis v. Woodbolt Distribution, Ltd.*, United States District Court, Northern District of California, Case No. C12-01136. On July 6, 2012, Plaintiffs voluntarily dismissed the California lawsuit, without prejudice, and, on July 20, 2012, filed the complaint in the instant action.

consulted experts having knowledge of the dietary supplement industry, the FDA regulatory process, food science and exercise physiology. Very early in the litigation, Class Counsel consulted with counsel for Woodbolt regarding the sales history of the Products and certain changes to Products which Woodbolt had begun to implement, including removing DMAA and NCG from all of the Products.

Plaintiffs and Class Counsel – based upon their evaluation of the facts, applicable law, and their recognition of the substantial risk and expense of continued litigation – believe this proposed Settlement to be an excellent result and submit that it is in the best interests of the Settlement Class, providing a meaningful recovery for the Settlement Class now. Two similar class actions filed by other counsel were dismissed pursuant to a Rule 12(b)(6) motion filed by Woodbolt.[5] Given the legal hurdles facing Plaintiffs, Plaintiffs believe that settlement is in the best interest of the class.

The proposed Settlement was negotiated at arm's length by highly experienced counsel on both sides and the benefits to individual consumers are reasonable and fair. After a full day of negotiations, a settlement was reached before Magistrate Judge Frances H. Stacy. Accordingly, the Parties respectfully move for preliminary approval of the Settlement.

## FACTUAL BACKGROUND

### A. C4 EXTREME, M5 EXTREME, AND N0 EXTREME

The Products at issue in this case are sold by Woodbolt as dietary supplements intended for use prior to a workout to provide energy and to enhance the muscle-building effects of weight

---

[5] The other two actions were *Bates v. General Nutrition Centers, Inc.,* United States District Court for the Central District of California Case No. 12-cv-1336, filed on February 15, 2012 ("*Bates*") and *Acquaviva v. GNC Holdings, Inc.,* United States District Court for the Central District of California Case No. 12-cv-2542, filed on March 23, 2012 ("*Acquaviva*") (collectively, the "California Cases"). The California Cases were subsequently consolidated (with the *Bates* Case No.), and Woodbolt obtained a full dismissal of the Consolidated Amended Complaint on October 12, 2012. (*See* Ex. B to Marshack Decl.)

lifting. Woodbolt contends that the Products are "dietary supplements" under applicable regulations, and are labeled as such pursuant to federal statute. Woodbolt further contends that there are published, clinical studies of the active ingredients which are at issue in the case, DMAA (C4 Extreme and M5 Extreme) and NCG (N0 Extreme), and that these studies demonstrate that the ingredients safely help improve certain muscle functions and can lead to more effective workouts. Plaintiffs contend that DMAA is a dangerous synthetic stimulant and that NCG is actually an FDA-approved drug , and that neither substance meets the definition of a "dietary ingredient" under applicable regulations. Woodbolt denies Plaintiffs' allegations.

The Products were developed by, and are marketed and advertised by defendant Woodbolt. The Products are primarily sold through third-party retailers (accounting for approximately 90% of all sales), although Woodbolt does offer the Products for sale directly to consumers through its website www.cellucor.com.[6]

The Products are relatively new to the market. C4 Extreme was first sold in January of 2011, M5 Extreme in February of 2010, and N0 Extreme in October of 2009. In early 2011, after selling M5 Extreme for only a year, Woodbolt reformulated the Product and ceased manufacturing M5 Extreme with DMAA. Woodbolt ceased manufacturing C4 Extreme with DMAA in August of 2011, only 7 months after it first offered the Product for sale. Woodbolt stopped using NCG in N0 Extreme in June of 2011.

Plaintiff Charles Ellis purchased C4 Extreme containing DMAA in January 2011; he purchased M5 Extreme containing DMAA in March 2011; and he purchased N0 Extreme containing NCG in May 2011. Plaintiff Ellis purchased the Products from GNC stores in Contra Costa County, California. Plaintiff Pamela Glover purchased C4 Extreme, M5 Extreme, and N0 Extreme in September 2011 from a GNC store in Santa Clara County, California.

---

[6] "Cellucor" is a dba of Woodbolt and is the brand name on the Products.

In February 2012, prior to receiving notice of any lawsuits against it, Woodbolt voluntarily directed its third party retailers to pull any remaining inventory of C4 Extreme and M5 Extreme with DMAA off their shelves and cease offering them for sale. Accordingly, Woodbolt contends that, for at least the past eight months, none of the Products offered for sale have included the ingredients that form the basis of Plaintiffs' allegations. Plaintiffs contend that Products containing the subject ingredients continued to be sold in GNC stores and on the internet for some time after February 2012.

## B.    THE LITIGATION

### 1.    Procedural History

Plaintiffs originally filed a putative California class action complaint in the Northern District of California on March 7, 2012, asserting eight (8) causes of action for: violations of the California Consumers Legal Remedies Act; violations of the California Unfair Competition Law; false and misleading advertising ; breach of implied warranty; breach of express warranty; and unjust enrichment. This Action was one of three similar actions filed in California District Courts between February and March 2012. (*See* footnote 4, *supra.*)

On April 17, 2012, the Parties attended a day-long mediation with plaintiffs' counsel in the *Bates* and *Acquaviva* actions before Judge Lourdes Baird (Ret.)[7] of JAMS in Santa Monica, California. The Parties were unable to reach a settlement during that mediation.

Subsequent to the mediation, Woodbolt wrote to Class Counsel and plaintiffs' counsel in the *Bates* and *Acquaviva* actions in an effort to meet and confer prior to filing motions to transfer venue, and asked them to consider voluntarily moving their cases to the Southern District of

---

[7] Judge Baird retired from her position as District Court Judge for the United States District Court for the Central District of California.

Texas, where Woodbolt is located.[8]  Plaintiffs in this Action elected to do so.  Plaintiffs in the *Bates* and *Acquaviva* actions did not.

Accordingly, on July 20, 2012, Plaintiffs filed their complaint in this Court asserting four causes of action for: (1) violation of the Texas Deceptive Trade Practices Act ("DTPA"); (2) breach of implied warranty; (3) breach of express warranty; and (4) unjust enrichment/restitution (the "Complaint") (Dkt. No. 1).  Woodbolt subsequently filed a motion to dismiss the Complaint on September 20, 2012 on the grounds that the federal Food and Drug Administration ("FDA") has primary jurisdiction to adjudicate Plaintiffs' claims (Dkt. No. 17).

Within the time period afforded by the DTPA, Woodbolt invoked its right to compel mediation pursuant to Texas Business and Commerce Code § 17.5051(a), and the Parties ultimately stipulated to mediate.  (Dkt. No. 12.)  On September 17, 2012, the Court ordered the Parties to mediate before Magistrate Judge Frances H. Stacy on October 24, 2012.  (Dkt. No. 16.)  The Parties attended the Court-ordered mediation, and were able to agree upon the terms reflected in the Settlement with the help of Judge Stacy.

Woodbolt has provided documents to Class Counsel to help them evaluate Plaintiffs' claims, including: scientific and clinical studies and reports supporting Woodbolt's advertising and marketing of the Products, as well as advertising and marketing materials, and sales data for the Products.

### 2.    The Parties' Contentions

The Complaint alleges that the Products were sold in violation of various State laws and were sold using advertisements and packaging that were false and misleading.  Specifically, the Complaint alleges that the Products should not have been sold as "dietary supplements," as defined by the FDCA, because they contained ingredients – DMAA and NCG – that were not

---

[8] Woodbolt's headquarters and only offices are in Bryan, Texas.

proper "dietary ingredients." The Complaint also alleges that Woodbolt failed to warn consumers about the potential dangers of the Products, and that the advertising and marketing of the Products made claims and promises about the Products' safety and efficacy that were not true. Plaintiffs believe they have a very strong case. However, given the uncertainties and expense of continued litigation, the limited sales history of the Products, and Woodbolt's voluntary removal of DMAA and NCG from all of the Products, Plaintiffs also believe that settlement is a viable option.

Defendant Woodbolt has denied, and continues to deny, all of Plaintiffs' allegations. Woodbolt claims that the advertising and promotion of the Products were accurate and truthful, that the Products are "dietary supplements" under the FDCA, are safe. Woodbolt further claims that the status of DMAA and NCG as proper "dietary ingredients" under the FDCA is supported by clinical and scientific studies. As such, Woodbolt contends that the Products were not advertised, promoted, marketed or sold in violation of the law. Although Woodbolt believes it has very strong defenses to Plaintiffs' allegations, Woodbolt is a relatively young company. The expenditure of a significant amount of its time and resources on legal expenses that could alternatively be spent on managing and developing its business will hinder the Company's ability to function properly, especially given the fact that they no longer include the ingredients at issue in this litigation in any of their products. Therefore, Woodbolt is desirous of finality to avoid the burden and expense of litigation.

### 3.     Independent Fact Investigation

As noted, Class Counsel's investigation in this matter began in July 2012, eight (8) months prior to the filing of the initial complaint in California, and thirteen (13) months prior to the filing of the Complaint in this Action. The Parties have exchanged documents, and Class Counsel has thoroughly reviewed scientific and clinical studies and reports relating to DMAA

and NCG, as well as labeling, advertising and marketing materials for the Products. Class Counsel also reviewed sales data for the Products. Class counsel analyzed Plaintiffs' claims under the consumer protection laws of two different states: California and Texas. Class Counsel investigated the use of DMAA in similar products, reviewed evaluations of DMAA by various sports organizations and the FDA, and thoroughly reviewed and analyzed the laws governing the marketing and sale of dietary supplements set forth in the FDCA and implementing regulations promulgated by the FDA. Class Counsel consulted experts having knowledge of the dietary supplement industry, the FDA regulatory process, food science and exercise physiology.

## C.   THE PROPOSED SETTLEMENT

### 1.   Settlement Negotiations

As discussed above, the Parties attended a full day mediation approximately one month after Plaintiffs filed their initial complaint in the Northern District of California. During the next several months, the parties continued to discuss settlement, but were not able to come to an agreement on their own. Accordingly, pursuant to the Court's order, the Parties attended a second mediation before Magistrate Judge Stacy on October 24, 2012, and were finally able to agree upon the terms reflected in the Settlement Agreement and described below.

### 2.   Summary of Proposed Settlement Terms

The Settlement Agreement provides Settlement Class Members with benefit options. Settlement Class Members can choose to receive either: (1) a reimbursement cash payment of $8 (the "Cash Payment"); or (2) a savings voucher for one (1) free product offered for sale on www.cellucor.com with the purchase of the identical product on said website, each of which has a manufacturer's suggested retail price of between $39.99 and $169.99 (the "Savings

Voucher").[9]  (Settlement Agreement, § 2(A).)  Woodbolt has agreed to pay up to $400,000 in Cash Payments to Settlement Class Members with Valid Claims, attorneys' fees and costs, incentive payments to the Class Representatives, and administrative costs.  If the amount of the Valid Claims submitted requesting a Cash Payment, attorneys' fees, costs, administrative fees, and the incentive payments collectively exceed $400,000, then the amount paid to each Settlement Class Member will be reduced on a pro rata basis.  (Settlement Agreement, § 2(B).) If any amount of the $400,000 remains after payment of all Cash Payments, fees, costs, taxes, and incentive awards, Woodbolt has agreed to make an in-kind donation of the Products to the United States Army, or other branch of the United States Military or other appropriate charity willing to accept the donation, with a total retail value that equals or exceeds the remaining amount.  (Settlement Agreement, § 3(F).)  The Savings Vouchers will be transferable, will not have any expiration date, and will not have any other restrictions.  There will not be any limit on the number of Savings Vouchers that may be distributed to Settlement Class Members, and the value of the Savings Vouchers will not be counted against the $400,000 mentioned above. (Settlement Agreement, § 2(C).)

In addition, the Settlement also provides for injunctive relief in the form of Woodbolt's agreement not to include DMAA or NCG in the Products for a period of three (3) years after the Settlement, unless the FDA does not issue an objection to the marketing or sale of products containing DMAA or NCG as dietary ingredients.

Before the Fairness Hearing, Class Counsel will submit a motion for an award of fees to counsel and reimbursement of expenses that in total will not exceed $112,500, which represents 28% of the total maximum amount of Cash Payments that Woodbolt has agreed to make to

---

[9] Woodbolt currently offers 16 different products for sale on www.cellucor.com.  Each of these products is available in a variety of sizes and flavors.

Settlement Class Members (or less than .03% of the possible total amount of value of the Savings Vouchers). (Settlement Agreement, § 5.) As discussed above, the award of attorneys' fees will be deducted from the total maximum Cash Payments that Woodbolt has agreed to make to the Settlement Class Members. The Class Representatives will make an application to the Court for an incentive payment of no more than $5,000 for each Class Representative (up to $10,000 total). (Settlement Agreement, § 6.) Class Counsel and Class Representatives understand that the amount of any attorneys' fee award and incentive payments are matters committed to the sole discretion of this Court. While Woodbolt will not object to Class Counsel's or the Class Representatives' requests, Woodbolt will not be responsible for payments going beyond the agreed upon limits stated above.

Pursuant to the Settlement, expenses associated with notice to the Settlement Class and claims administration fees will be paid from the total maximum Cash Payments that Woodbolt has agreed to make to the Settlement Class Members.

### 3. Proposed Claims Process for Distribution of Reimbursement Payments

To encourage participation, the claim form (Exhibit A to the Settlement Agreement) is easy to complete and simply requires Settlement Class Members to enter basic information, including their name, address, email, telephone number, and to declare under penalty of perjury that they purchased at least one of the Products during the relevant Class Periods.[10] Settlement Class Members can fill out a form on the Settlement website and submit their claim online, download a claim form from the Settlement website and submit it by mail, or contact the Settlement Administrator by telephone (a toll-free number) or mail to request a claim form,

---

[10] The relevant Class Periods differ for each Product and represent the time between when each Product was first offered for sale and at least two and a half months after Woodbolt removed the Products with DMAA or NCG from the market.

which the Settlement Administrator will mail to the Settlement Class Member and the Member can return by mail. In short, the Settlement plan is designed to make the claims process as simple and user friendly as possible, and thereby encourage the fullest possible participation in the Settlement.

The Settlement Administrator will institute procedures to detect potentially fraudulent claims. Settlement Class Members who submit Valid Claims will receive, at their election, either a payment of $8, or a Savings Voucher for one (1) free product offered for sale on www.cellucor.com with the purchase of the identical product on said website, which retail for between $39.99 and $169.99 per unit.

### 4.  **What Is Being Released**

If the Settlement is approved, the Settlement Class Members will release on a nationwide basis all claims for economic damages concerning the conduct challenged in the litigation or that arise out of or are connected in any way with the advertising, labeling, branding, marketing, or sale of the Products, whether known or unknown, from the relevant Class Periods. The Settlement Agreement does not release Woodbolt from any liability based on future conduct.

### 5.  **Termination**

Under the Settlement, Woodbolt and the Class each has the right to terminate the settlement if (a) the other party breaches a material provision of the Settlement Agreement or the Preliminary Approval Order; (b) the attorney general or another officer of the government intervenes in the Action to object to the Settlement; (c) more than 500 individuals opt out of the Settlement Class; or (d) if a Settlement Class is conditionally certified on less than a nationwide basis (i.e. fewer than all 50 states); or (e) upon other grounds agreed upon by the Parties and permitted by the Court.

### 6. The Notice and Claims Administration Program

Settlement Class Members will be notified of the Settlement, and advised of the steps needed to either submit claims or opt out of the Settlement, through a notice program consisting of publication notice, as well as through a website dedicated to the Settlement designed by the parties and administered by the Settlement Administrator.[11]  The components of the notice program (collectively referred to as "Class Notice") are as follows:

*(a)*  ***Publication Notice.***  The Settlement provides for notice to be published in *Planet Muscle* and *Fitness Rx for Men* magazines for no less than 30-days.  These magazines are distributed nationally.  (*See* Exhibit B to the Settlement Agreement.)

*(b)*  ***Internet Notice.***  A website will be developed by the Settlement Administrator for Settlement Class Members to learn about the litigation and settlement.  The webpage will be referenced in the publication notices.  The webpage will provide access to the Notice, Claim Forms, this Court's Orders, "Frequently Asked Questions" (*see* Exhibit C to the Settlement Agreement), and updates concerning the Settlement.

*(c)*  ***Toll-free telephone number.***  The Settlement Administrator will provide and manage a toll-free number that Settlement Class Members can call to ask questions regarding the Settlement.

## ARGUMENT

## I. THE PROPOSED SETTLEMENT SHOULD BE PRELIMINARILY APPROVED

### A. The Standard for Preliminary Approval.

Rule 23(e) requires judicial approval for a compromise of claims brought on a class basis. FED. R. CIV. P. 23(e) ("The claims...of a certified class may be settled ... only with the court's

---

[11] Because more than 90% of Settlement Class Members purchased the Products from third-party retailers, the contact information for Settlement Class Members is not reasonably available to the Parties.

approval.") In deciding whether to approve a proposed settlement, the Fifth Circuit has a strong judicial policy that encourages class settlements, especially in complex class actions. *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982) (affirming approval of class action settlement, recognizing "the strong judicial policy favoring settlements") ("*In re Chicken*"); *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977) ( affirming approval of class action settlement, stating "Settlement agreements are 'highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits'"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *Murillo v. Texas A & M Univ. Sys.*, 921 F. Supp. 443, 445 (S.D. Tex. 1996) ("Settlements in class action suits are encouraged and favored.") Accordingly, in making its assessment pursuant to Rule 23(e), the Court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is fair, adequate and reasonable and is not the product of collusion between the parties. FED. R. CIV. P. 23(e); *In re Chicken,* 669 F.2d at 238.

At the preliminary approval stage, the Court need only determine whether the proposed settlement appears on its face to be fair and falls within the range of possible judicial approval. *In re OCA, Inc. Sec. & Derivative Litig.*, 2008 WL 4681369, *11 (E.D. La. Oct. 17, 2008) ("If the proposed settlement discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval"); MANUEL FOR COMPLEX LITIGATION § 21.63 ("At the stage of preliminary approval, the questions are simpler, and the

court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval.") There is an initial presumption of fairness when a proposed settlement that has been negotiated at arm's length by experienced counsel is presented to the court for preliminary approval. *Murrillo,* 921 F. Supp. at 445. Here, the Court's only concern is whether the settlement has any "glaring deficiencies" that would make final approval "untenable." *McNamara v. Bre-X Minerals Ltd.*, 214 F.R.D. 424, 428 (E.D. Tex. 2002).

When the Court makes the ultimate determination of fairness at a later point, the Court will be asked to review the following factors: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representative, and the absent class members. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982).

The Parties here only request that the Court take the first step in the settlement approval process and grant preliminary approval of the proposed Settlement. Given the complexities of this Action and the continued risks if the Parties were to proceed, the Settlement represents a favorable resolution and eliminates the risk that the Settlement Class might recover less or nothing at all. As summarized below, and as will be detailed further in a subsequent motion for final approval of the Settlement, a preview of the factors considered by courts in granting final approval of class action settlements demonstrates that this Settlement is well within the range of possible approval.

**B.**     <u>The Proposed Settlement Meets the Standard for Preliminary Approval</u>.

    **1.**     <u>The Settlement Was Negotiated at Arm's Length By Experienced Counsel</u>.

Courts recognize that the opinion of experienced counsel supporting the settlement after vigorous arm's-length negotiations is entitled to considerable weight. *See, e.g., Murrillo*, 921 F. Supp. at 445. Here, Class Counsel has thoroughly analyzed the advertising and marketing at issue in this litigation, has analyzed the sales records, and has conducted an extensive investigation into the scientific studies and reports underlying the claims made therein. Thus, by the time settlement negotiations began, Class Counsel had a comprehensive understanding of the strengths and weaknesses of the claims, both factually and legally, and was able to engage in a rigorous negotiation process with Woodbolt. A proposed settlement that appears to be the product of serious, informed, non-collusive negotiations should be given effect. *Ibid*.

Additionally, throughout the litigation and settlement negotiations, Woodbolt has been represented by experienced counsel from a prominent national law firm. Counsel for Woodbolt was equally well-informed regarding the case, and their representation of Woodbolt was no less rigorous than Class Counsel's representation of the Settlement Class.

As a result, the Parties' settlement negotiations were demanding. The extensive negotiations required two days of mediation before two different mediators, several in-person and telephonic meetings apart from the mediations, and multiple revisions of the Settlement Agreement. Ultimately, the Parties reached a settlement amount based on, among other things, the merits of the allegations, the size of the class, and the financial resources of Woodbolt. It was only possible to reach this conclusion based on the Parties' familiarity with the facts, issues, arguments and risks in the case. With this background, there is no doubt that the Settlement was reached without collusion and after good-faith bargaining among the parties. This factor

supports a finding that the Settlement is fair, adequate, and reasonable for purposes of preliminary approval.

<h3>2.     <u>The Settlement Has No "Glaring Deficiencies" and Is Appropriate for Preliminary Approval.</u></h3>

The Settlement has no "glaring deficiencies" and is well within the range of reason. *See McNamara*, 214 F.R.D. at 428  As set forth above, the Settlement provides for reimbursement payments to Settlement Class Members of $8, and over $42 million[12] in savings to Settlement Class Members on any product sold by Woodbolt.  The only limitation, as set forth in the Settlement Agreement, is a $400,000 limitation on aggregate reimbursement payments, with a pro rata reduction if the Valid Claims, attorneys' fees and costs to Class Counsel, the incentive payments to the Class Representatives, and administrative costs in the aggregate exceed this amount.  However, the $400,000 limitation does not apply to the Savings Vouchers which, independently, have substantial value.  The claim process is straight-forward.  There is no unreasonable barrier to making a claim for payment.  In addition, the proposed Settlement also provides for considerable injunctive relief in the form of Woodbolt's agreement not to include DMAA or NCG as ingredients in the Products for three years to address the concerns raised by Plaintiffs' Complaint.  This injunctive relief benefits not only the Settlement Class, but also future customers who purchase the Products.

The settlement negotiations are only one barometer of the fairness of a settlement.  The risks involved in continuing the litigation are another.  There can be no doubt that continuing this litigation would entail a lengthy and highly expensive legal battle, involving complex legal and factual issues, with Plaintiffs facing substantial risks.  For instance, Woodbolt has already filed a

---

[12] This number was calculated by taking Woodbolt's most expensive product, which sells for $169.99 per unit on Woodbolt's website www.cellucor.com, and multiplying it by 250,000, which represents an estimated number of the members of the Settlement Class.

Motion to Dismiss the entire Complaint. (*See* Dkt. No. 17.) As discussed above, only a couple of weeks ago, Woodbolt obtained full dismissal of a nearly identical putative consolidated class action filed in the United States District Court for the Central District of California after filing a similar motion to dismiss. (*See* Ex. B to Marshack Decl.) In addition, even if this case were to survive Woodbolt's Motion to Dismiss, Woodbolt would oppose class certification. Further, assuming, *arguendo,* a class was certified and such certification withstood appeal, Woodbolt would present various defenses at the liability and damages phases of the proceedings and would likely bring motions for summary judgment on some, if not all, of Plaintiffs' claims. If the case were to survive and proceed to trial, expert testimony would undoubtedly be necessary. An ensuing "battle of the experts" would make the outcome of trial uncertain for both Parties. Further, even after a trial concluded, there would likely be lengthy appeals. Moreover, it is highly unlikely that Woodbolt could afford to pay a potentially sizeable judgment. Given these many uncertainties, "[t]he bird in the hand is to be preferred to the flock in the bush." *Rubenstein v. Republic Nat. Life Ins. Co.*, 74 F.R.D. 337, 347 (N.D. Tex. 1976).

Similarly, while Plaintiffs believe they have a very good chance of prevailing on the merits in this litigation, the circumstances of the case militate in favor of settlement. Significantly, the FDA has recently taken a position on the use of DMAA which Plaintiffs believe supports their case. In April 2012, the FDA issued warning letters to ten manufacturers and distributors of dietary supplements containing DMAA stating that the companies had failed to provide the FDA with evidence of the safety of their products. The FDA also warned the companies that synthetically-produced DMAA is not a "dietary ingredient" and, therefore, is ineligible to be used as an active ingredient in a "dietary supplement." (See Plaintiffs'

Complaint, ¶ 40, Exs. 20-21.)[13]  However, the cost and substantial risk in litigating and taking a case to trial must always be considered.  This is especially true of class actions where plaintiffs must run the gauntlet of pleading challenges, discovery battles, competing experts, class certification proceedings, summary judgment motions and trial, as well as writs and appeals at various stages of the litigation.  These risk factors militate in favor of settlement here.

Against this background, an early settlement providing the benefits afforded here represents an excellent result for the Settlement Class.  Woodbolt's $400,000 all-cash payment, as well as vouchers worth over $42 million in savings on future purchases of any of Woodbolt's entire portfolio of products offered to Settlement Class Members, provides significant compensation to the Settlement Class.  The relief provided by this Settlement will be available to class members earlier – likely years earlier – than would be the case if litigation against Woodbolt survived through its Motion to Dismiss, class certification, trial and appeal and the Class was ultimately successful.  The injunctive relief consisting of Woodbolt's agreement not to use DMAA or NCG in the Products for three years also provides a substantial benefit to *all* consumers, not just the Settlement Class.  Accordingly, the recovery of the Settlement Class, obtained in the face of the risk of a lesser recovery or no recovery at all, supports approval of the Settlement.

### 3.  The Proposed Notice Plan Satisfies Rule 23 and Due Process.

Notice of a proposed settlement must be given to class members in the most practicable manner under the circumstances, describing the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.  *See* 23(c)(2)(B).

As the Supreme Court explained in *Mullane v. Cent.  Hanover Bank & Trust Co.,* 339

---

[13] Woodbolt did <u>not</u> receive a warning letter from the FDA.

U.S. 306 (1950):

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections ... The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Id.* at 314. The proposed Class Notice more than satisfies this standard.

In this case, there will be notice published in two national bodybuilding magazines, *Planet Muscle* and *Fitness Rx for Men*, for no less than 30-days each, as well as the establishment of a dedicated website and a toll-free telephone hot line. Because more than 90% of the sales of the Products are made by third-party retailers, the names and contact information of Settlement Class Members is not reasonably available to Woodbolt or Plaintiffs. "It is well established that notice by publication can satisfy due process when information required to identify individual class members cannot be procured through reasonable effort." *Klein v. O'Neal, Inc.*, 2009 WL 1174638, *2 (N.D. Tex. Apr. 29, 2009), *see also, Hoge v. Parkway Chevrolet, Inc.,* 2007 WL 3125298, at *18 (S.D.Tex. Oct.23, 2007) ("Courts have found that publication notice can satisfy Rule 23." (citing numerous cases)). The notice plan in this action is reasonably calculated to reach the largest number of Settlement Class Members based upon the information reasonably available to the Parties.

The proposed Notice informs the Settlement Class of: (1) the Settlement claims process; (2) the options available to Settlement Class Members; (3) the benefits provided by the Settlement, i.e., a cash payment or a savings voucher; (4) the three-year prohibition on Woodbolt including DMAA or NCG as ingredients in the Products; (5) the in-kind donation of Products to the United States Military; (6) the attorneys' fees and expenses sought; (7) the right of Settlement Class Members to object to the Settlement or seek exclusion from the Settlement

Class; (8) the dates and deadlines for certain Settlement-related events; and (9) the settlement website and toll-free number that Settlement Class Members can call to ask questions or obtain more information about the Settlement. Here, the proposed Notice is adequate and complies with due process and Rule 23.

### C. The Proposed Settlement Class Meets the Prerequisites for Class Certification under Rule 23[14].

Rule 23(a) sets forth four prerequisites to class certification applicable to all class actions, including classes for the purpose of settlement: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. In addition, the class must meet one of the three requirements of Rule 23(b). FED. R. CIV. P. 23; *see also* MANUAL FOR COMPLEX LITIGATION, Fourth, § 21.633 (Fed. Jud. Ctr. 2004).

#### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is "impracticable." FED. R. CIV. P. 23(a)(1)." For purposes of Rule 23(a)(1), "[i]mpracticable does not mean impossible, rather that joinder would be extremely difficult or inconvenient, and depends on the circumstances of the case, not merely the sheer numbers of putative class members." *In re Seitel, Inc. Sec. Litig.*, 245 F.R.D. 263, 269 (S.D. Tex. 2007). Relevant factors include: the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981).

Based on the thorough factual investigation described above, Class Counsel and Woodbolt estimate that there are approximately 250,000-300,000 unique customers in the United

---

[14] Woodbolt denies the allegations regarding certification, but stipulates to certification for the sole purpose of effectuating this Settlement. Woodbolt reserves the right to challenge certification if this Settlement fails to be considered "Final" as that term is defined in the Settlement Agreement.

States who purchased the Products during the relevant Class Period. Given the number and the nationwide geographic distribution of the Settlement Class Members, in addition to the small amount of each class members' claim and the challenge in identifying individual class members because the vast majority purchased the Products from third-party retailers, joinder of all Settlement Class Members would be impracticable, and the proposed Settlement Class easily satisfies Rule 23's numerosity requirement. *Zeidman*, 651 F.2d at 1038.

### 2. Commonality

The Rule 23(a)(2) requirement is satisfied where, as here, there exist "questions of fact and law which are common to the class." FED. R. CIV. P. 23(a)(2). "The interests and claims of the various plaintiff's need not be identical." *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir. 1993). Rather, the commonality test is met where there is "'at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir.1997) (quoting *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir. 1982)). For this reason, " '[t]he threshold of 'commonality' is not high.'" *Forbush,* 994 F.2d at 1106 (quoting *Jenkins v. Raymark Indus.,* 782 F.2d 468, 472 (5th Cir. 1986)).

A class asserting claims based on "uniform misrepresentations" or a common course of conduct satisfies the commonality requirement even where the class members are exposed to different misrepresentations at different times. *See, e.g., In re Elec. Data Sys. Corp. Sec. Litig.,* 226 F.R.D. 559, 564 (E.D. Tex. 2005) *aff'd sub nom. Feder v. Elec. Data Sys. Corp.,* 429 F.3d 125 (5th Cir. 2005).

The commonality requirement is easily met here. While the proposed Settlement Class Members may have been exposed to different representations, the common question of whether they were harmed by Woodbolt's alleged omissions and course of fraudulent conduct is

sufficient to satisfy Rule 23(a)(2)'s commonality requirement. *Id.* at 564. The claims of each Settlement Class Member raise the common contention, capable of class-wide resolution, that the claims and omissions made in the advertising and marketing of the Products were false and misleading. Accordingly, all Settlement Class Members share the same causes of action and suffered the same or similar harm (i.e., they were allegedly misled about the Products' safety and efficacy and purchased the Products based upon alleged misrepresentations about the Products' capabilities and status as "dietary supplements"), and all are entitled to pursue claims for damages and injunctive relief. Rule 23(a)(2)'s requirement of a common question of law or fact is therefore satisfied.

### 3. Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class and seeks to ensure that the interests of the named plaintiffs align with those of the class they purport to represent. FED. R. CIV. P. 23(a)(3). "[T]he test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001) (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)). No complete identity of claims is required. "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James,* 254 F.3d at 571 (citing 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.24[4] (3d ed. 2000)).

Typicality is readily established here. The nature of the Products are the same for all Settlement Class Members, and the advertising and marketing concerning the benefits, safety and efficacy of the Products by Woodbolt were made to the consuming public at-large (including to Settlement Class Members). Accordingly, to the extent there are untrue or misleading statements

and/or material omissions in the advertising or marketing of the Products, the Class Representatives and the absent Settlement Class Members all assert the same claims. All of their claims are predicated on the same wrongful course of conduct – namely, Woodbolt's alleged omissions and misrepresentations about the benefits, safety and efficacy of Product.

The proposed Class Representatives purchased the Products after reading representations made on the Products' packaging and labels. Accordingly, they suffered the same injury and, like the absent Settlement Class Members, are entitled to seek damages and injunctive relief. The typicality requirement is satisfied.

### 4. **Adequacy**

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "To meet the adequacy-of-representation requirement of Rule 23(a)(4), Courts consider (1) whether the named representative shares common interest with other class members, and (2) whether the named representative will vigorously prosecute the interests of the class through the class counsel." *Schwartz v. TXU Corp.*, 2005 WL 3148350, *14 (N.D. Tex., Nov. 8, 2005); *see also, Stoffels v. SBC Communications, Inc.,* 238 F.R.D. 446, 454 (W.D. Tex. 2006) (same). Both requirements are satisfied here.

Class Counsel is qualified, experienced, and thoroughly familiar with complex class actions. Lead Class Counsel, Robert Esensten, is a member of the California bar and has been licensed to practice law for nearly 37 years. Class Counsel is also admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and Federal Circuit, United States Tax Court, as well as the United States District Courts for the Central District of California and Southern District of Texas. Class Counsel has prosecuted hundreds of cases in both state and federal courts, including numerous class actions, and has

presented numerous appeals, as lead or co-counsel, in California State and Federal District Courts, and the Courts of Appeal for the Ninth Circuits. Class Counsel has extensive class action experience, including, among other areas, class actions concerning deceptive advertising of consumer products, wage and hour violations, and automobile defects. (*See* Declaration of Gregory B. Scarlett ("Scarlett Decl.") ¶¶ 10-25.) Class Counsel specializes in consumer protection and complex commercial litigation, and has significant experience litigating a wide array of legal topics including, but not limited to, the scope of the various states' consumer protection and false advertising statutes (including the statutory predicate for the instant lawsuit – the Texas Deceptive Trade Practices Act); contract issues; real property disputes; and intellectual property matters. This proven track record demonstrates Class Counsel's ability to prosecute this class action with expertise and vigor. Class Counsel believes that the settlement reached in this case is fair, reasonable and adequate. (Scarlett Decl. ¶¶ 2-9.).

With respect to the Class Representatives, the "adequacy" requirement asks only whether the representatives' interests are comparable to those of the absent class members or conflict with those of the class. *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,* 851 F. Supp. 2d 1040, 1056 (S.D. Tex. 2012) (citing *Langbecker v. Elec. Data Sys. Corp.,* 476 F.3d 299, 314 (5th Cir. 2007)). A class representative must "possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625-626 (1997). (internal quotation marks omitted).

In this Action, the Class Representatives' interests are identical to the interests of other Settlement Class Members – maximizing recovery as expeditiously as possible. In addition, their injury is the same as other Settlement Class Members – the loss of the purchase price of the Products, which they allege they would not have purchased but for Woodbolt's alleged

omissions and misrepresentations. No conflict of interest exists among Plaintiffs and the Settlement Class, let alone a conflict that would present an obstacle to certification of the proposed class for settlement purposes. Accordingly, the Rule 23(a)(4) requirements are satisfied.

### 5. In Addition, the Requirements of Rule 23(b)(3) Are Satisfied.

Once the four prerequisites of Rule 23(a) are met, as in this case, the proposed settlement class must also satisfy the requirements of either Rule 23(b)(1), (2) or (3) to be certified. *Amchem,* 521 U.S. at 613. For certification of a settlement class under Rule 23(b)(3), it must be shown that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).

### (a) Common Issues Predominate.

As the United States Supreme Court has explained, "predominance is a test readily met in certain cases alleging consumer fraud...." *Amchem,* 521 U.S. at 625. This is even more true in a settlement-only class action, where the court certifying the class need not examine issues of manageability. *Id.* at 620; *see also, In re Heartland,* 851 F. Supp. 2d at 1059.

To satisfy this requirement, common questions merely need to "predominate" – they do not need to be exclusive or dispositive. As courts in the Fifth Circuit have determined, "the mere existence of individual questions of reliance is not sufficient to warrant a ruling that common questions of law of fact do not predominate." *Ramsey v. Arata,* 406 F. Supp. 435, 441 (N.D. Tex. 1975); *Republic Nat. Bank of Dallas v. Denton & Anderson Co.,* 68 F.R.D. 208, 215 (N.D. Tex. 1975) ("Predominance of common questions of law or fact under Rule 23(b)(3) is not a numbers game. The true test is whether common or individual questions will be the object of

most of the efforts of the litigants and the Court.")  "Though there may be several individual

questions present, if the basic issue is still common and pervasive, class status is appropriate."

*Republic Nat. Bank of Dallas*, 68 F.R.D. at 215; *see also In re Cooper Companies Inc. Sec.

*Litig.*, 254 F.R.D. 628, 640 (C.D. Cal. 2009) (Predominance exists where the class members

"have more issues keeping them together than driving them apart.")

Here, as discussed above, there are a number of questions common to the members of the

Settlement Class, and all of the Settlement Class Members have allegedly been injured by the

same alleged wrongful course of conduct.  The common legal and factual questions are at the

core of the litigation and are focused on the actions of Woodbolt, not Plaintiffs.  The central

common question that predominates is whether Woodbolt made claims and omissions in its

advertising and marketing of the Products about the Products' benefits, safety and efficacy that

were false or misleading.  Accordingly, the predominance requirement is satisfied.

**(b)**      **A Class Action is the Superior Method to Adjudicate These Claims.**

"The superiority requirement asks the court to balance, in terms of fairness and

efficiency, the merits of a class action against those of alternative available methods of

adjudication." *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 428 (S.D. Tex. 1999).

The superiority inquiry generally considers four factors: (1) the interest of members of the class

in individually controlling the prosecution or defense of separate actions; (2) the extent and

nature of any litigation concerning the controversy already commenced by or against members of

the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the

particular forum; and (4) the difficulties likely to be encountered in the management of a class

action. Fed.R.Civ.P. 23(b)(3).  However, the United States Supreme Court has stated that,

"[c]onfronted with a request for settlement-only class certification, a district court need not

inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial." *Amchem,* 521 U.S. at 620 (citation omitted).

The remaining three superiority factors (1, 2 and 3 above) indicate that the class action is the best vehicle for conducting this litigation. Since the cost of complex consumer litigation against a company is extremely high and the individual returns comparatively low, the class action is the most feasible manner of bringing Plaintiffs' claims. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem,* 521 U.S. at 617 (internal citation omitted). Here, the Settlement Class consists of an estimated 250,000-300,000 members, but the average claim would be relatively small; consequently, the burden and expense of separate litigation would outweigh any recovery. Realistically, a class action presents the *only* way most Settlement Class Members would be able to redress their grievances relating to the advertising and marketing of the Product. A class action is therefore the superior method to adjudicate this Action.

In light of the foregoing, all of the requirements for class certification are satisfied.[15] Thus, the parties respectfully request that the Court certify the Settlement Class for settlement purposes.

## II.     THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, MERITING PRELIMINARY APPROVAL

### A.     The Preliminary Fairness Determination.

Under Federal Rule of Civil Procedure 23(e), a court should approve a proposed class action settlement if it determines that the settlement is "fair, reasonable, and adequate, as well as

---

[15] As stated previously, Woodbolt denies the allegations regarding certification, but stipulates to certification for the sole purpose of effectuating this Settlement. Woodbolt reserves the right to challenge certification if this Settlement fails to be considered "Final" as that term is defined in the Settlement Agreement.

consistent with the public interest." *Cotton,* 559 F.2d at 1330. As noted above, preliminary approval should be granted where "the proposed settlement discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval." *In re OCA, Inc. Sec. & Derivative Litig.,* 2008 WL 4681369 at *11. The proposed Settlement in this case meets that test.

## B. The *Parker* Factors.

Though not necessary at this stage of preliminary approval, the Parties note, anticipating final approval, that the Fifth Circuit has adopted a six-factor test to determine whether a settlement is "fair, reasonable, and adequate." The elements of this test – known as the *Parker* factors – are: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representative, and the absent class members. *Parker,* 667 F.2d at 1209. These factors weigh in favor of a determination that the proposed settlement is "fair, adequate, and reasonable."

### 1. The Settlement Was Not a Product of Fraud or Collusion.

As stated above in Section I.B.1., "[t]here is an initial presumption of fairness when a proposed class settlement was negotiated at arm's length by counsel for the class," and not a product of collusive negotiations or fraudulent actions between the parties. *Murillo,* 921 F. Supp. 443, 445. As also discussed above, the Settlement in this case resulted after *two* separate mediations before two mediators, including one before Magistrate Judge Frances H. Stacy. In addition, there were multiple additional in-person and telephonic negotiations between counsel

for the Parties. Moreover, Woodbolt expended the effort and expense of preparing a detailed motion to dismiss, demonstrating its intent to vigorously defend itself against Plaintiffs' claims. If the Parties had been involved in collusive negotiations, there would have been no reason for Woodbolt to file its Motion to Dismiss. Because the Settlement was reached with the help of a mediator after protracted arms-length negotiations between the Parties, this factor weighs in favor of a finding that the settlement was fair and reasonable

2. **Complexity, Expense, and Likely Duration of the Litigation.**

The second *Parker* factor is concerned with weighing "the benefits of the proposed settlement against the costs and risks of continued litigation." *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 529 (N.D. Miss. 2003). In evaluating this factor, a court should determine whether settling "avoids the risks and burdens of potentially protracted litigation," "eliminates the transaction costs that further proceedings would impose," and/or "provides relief for the class sooner than continued litigation would." *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004).

Because the current litigation is in its embryonic stage, the path to a final judgment would be very long, and extremely expensive. As discussed above, if this putative nationwide class action litigation were to continue, the Parties would bear the significant expenses inherent in, among other things, pre-trial motion practice relating to Woodbolt's motion to dismiss, class certification (which Woodbolt would oppose) and summary judgment. The Parties would also bear the expenses of hiring expert witnesses, and the expenses attendant to trial preparation, the trial itself, post-trial motions and appeals. Settling the litigation at such an early stage and for the significant benefits to Settlement Class Members in the form of Cash Payments, Savings Vouchers, and injunctive relief, represents a desirable and certain result and a fair and adequate resolution of this matter. *See, e.g., Smith v. Tower Loan of Mississippi, Inc.*, 216 F.R.D. 338, 353-54 (S.D. Miss. 2003) *aff'd sub nom. Smith v. Crystian*, 91 F. App'x 952 (5th Cir. 2004)

(approving settlement where "burdens on the parties and the courts [of continuing litigation] would be extraordinary.")

### 3. The Stage of the Proceedings and Discovery Completed Support Approval of the Settlement.

The third *Parker* factor, "the stage of proceedings and discovery completed," asks the Court to consider whether the litigation is at a stage that permits the parties to adequately assess their respective positions. *See Ayers,* 358 F.3d at 369 (factor weighs in favor of approval, because "the parties and the district court possess ample information with which to evaluate the merits of the competing positions"). Here, as noted above, Class Counsel conducted an extensive (8 month) pre-filing investigation of this case. Then, almost immediately after learning of this lawsuit, and in the interest of avoiding the expense of litigating, Woodbolt began cooperating with Class Counsel and providing documents (the same documents it would have provided as Initial Disclosures and pursuant to formal document requests) informally requested by Class Counsel to assist Class Counsel in evaluating Plaintiffs' claims.

For example, Woodbolt provided, and Class Counsel reviewed, comprehensive sales data during the Class Period for the Products. Woodbolt also provided scientific research and clinical studies regarding the ingredients in the Products that Woodbolt contends support its disputed advertising claims, which Class Counsel has also reviewed. In addition, Woodbolt provided copies of its advertising to Class Counsel for review. Consequently, at the time the Parties agreed to the Settlement, they had a firm understanding of the strengths and weaknesses of the claims and defenses in this case.

If this Settlement is ultimately not approved, a substantial amount of work remains in this litigation for both Parties including depositions, exchange of expert reports, expert depositions, motions for class certification, motions for summary judgment, other pre-trial motions, trial and

appeals. However, performing this work will not elucidate any of the key questions and issues surrounding Woodbolt's liability, which Class Counsel has already thoroughly investigated in advance of the settlement negotiations. Beyond expert witnesses, it is unclear how further discovery would add anything to the consideration of Woodbolt's liability. Class Counsel had an adequate opportunity to "evaluate the merits" of the case before negotiating. *In re Heartland*, 851 F. Supp. 2d at 1068 (noting that where experienced class counsel has been able to evaluate the merits of the case and recommends a settlement based thereon, class counsel's endorsement "is entitled to deference"). Thus, this factor weighs strongly in favor of approving the Settlement.

### 4. The Factual and Legal Obstacles of Prevailing on the Merits Favor Settlement.

Evaluation of this factor, the Fifth Circuit has noted,

> "contains an internal tension. A district court faced with a proposed settlement must compare its terms with the likely rewards the class would have received following a successful trial of the case. The court, however, must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial."

*Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (internal citation and quotation marks omitted).

As noted above, Woodbolt has filed a motion to dismiss in this Action (Dkt. No. 17), to which Plaintiffs have not yet responded. As also noted above, Woodbolt obtained a full dismissal of a nearly identical putative class action in a district court in California only a few weeks ago. Accordingly, there is a chance that Plaintiffs will not be able to proceed beyond the pleading stage in this litigation. If the case does progress past the pleading stage, Woodbolt has raised a myriad of defenses to Plaintiffs' claims, and has presented Plaintiffs with the scientific studies on which its advertising and marketing claims about the Products are based. While

Plaintiffs are confident that their claims are legally sound and supported by substantial evidence, there is always the possibility that the Court (or a jury) may disagree. Ultimately, assuming Plaintiffs can survive Woodbolt's numerous challenges, this case will likely to come down to a "battle of the experts," with no guarantee as to who a fact-finder would believe. *Garza v. Sporting Goods Properties, Inc.*, 1996 WL 56247, *16 (W.D. Tex. Feb. 6, 1996) (stating that the "battle of the experts which will take place at trial" presents "sufficient risk to each side" to support settlement). The inherently unpredictable risks in establishing liability weigh in favor of settlement. *See id.* ("Even if the plaintiffs were to continue with the litigation and prevail at trial, and even if the damages awarded were in excess of the amount of the settlement obtained, there is no doubt lengthy appeals would follow as would enormous costs and expenses. All these factors, i.e. the litigation risks concerning proof of defect, the cost of continued litigation, and the possible limits to plaintiffs, recovery, support a compromise in this matter and the Court's approval of that compromise").

Accordingly, this factor favors approval of the Settlement.

### 5. The Range of Recovery and the Certainty of Damages Favor Settlement.

This factor is related to the prior factor, and requires a Court to determine "whether the range of possible recovery or the benefit of the settlement to plaintiffs outweighs the risks of proceeding through litigation." *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 290 (W.D. Tex. 2007). Such determination need not be exact, because "[t]he determination of the range of possible recovery is not susceptible to mathematical precision." *In re Shell Oil Refinery*, 155 F.R.D. 552, 565 (E.D. La. 1993).

Here, the Settlement will lead to significant monetary benefits and injunctive relief to the Settlement Class. The value of the Savings Vouchers alone totals approximately $42 million,

and the fund available for cash payments to class members totals $400,000. Perhaps most significantly, the injunctive relief the Settlement Class is obtaining – Woodbolt's agreement not to include DMAA or NCG in the Products – is the ultimate injunctive relief that would have been available to Plaintiffs at trial. Plaintiffs could not be assured that such injunctive relief would have been afforded by this Court.[16]

Accordingly, the Settlement affords significant relief to the Settlement Class, as compared to the benefits available should the litigation proceed through trial. Indeed, a successful trial on the merits could likely yield only two of the types of relief provided by the Settlement Agreement: (1) monetary relief; and (2) injunctive relief. Under the terms of the Settlement, however, Settlement Class Members receive the benefit of monetary relief, injunctive relief, *and* free products (some of which are valued at nearly $170). These significant benefits certainly render the Settlement fair, adequate, and reasonable.

In addition, Plaintiffs may face challenges even establishing damages with any certainty. The alleged damage in this case cannot be measured solely by determining the amount of sales during the Class Period. If Plaintiffs were to succeed in establishing liability, Woodbolt will likely argue that, even if class members did not receive the entire value for which they paid, they received *some* value from the Products (demonstrated by the fact that many class members purchased the Products more than once), which will undoubtedly require expert testimony to determine. In addition, Woodbolt has testimonials from many of its customers who believe the Products have been efficacious. Accordingly, the risk of being unable to establish damages favors settlement.

---

[16] As an additional benefit of the Settlement, if the claims of Settlement Class Members do not reach $400,000 (after attorneys' fees, costs, incentive awards, and administrative costs have been paid therefrom), Woodbolt will make an in-kind donation of the Products to the United States Military. Based upon the volume of units sold to the United States Military, Woodbolt believes that members of the military make up a significant percentage of Settlement Class Members, so this donation is intended to directly benefit Settlement Class Members.

### 6. The Respective Opinions of the Participants Favor Preliminary Approval of the Settlement.

The final *Parker* factor is concerned with the opinions about the Settlement of Class Counsel, the Class Representatives, Defendant, and absent class members. *Parker,* 667 F.2d at 1209. Of course, at this stage, all of the participants are in favor of the Settlement, and the Court cannot measure the number of objectors since class notice has not yet been issued. However, the Court should consider the Class Representatives' and Class Counsel's support the proposed Settlement, and the fact that the terms of the Settlement were negotiated before Magistrate Judge Stacy, as preliminary indicia of the Settlement's fairness.

### C. The Requested Attorneys' Fee Award and Compensation to the Class Representatives Are Fair And Reasonable.

At the time of final approval, Class Counsel will apply to the Court for an award of attorneys' fees and reimbursement of expenses in the amount not to exceed $112,500, which Woodbolt does not oppose (Settlement Agreement, § 5). Class Counsel will demonstrate the reasonableness of this application under the "common fund" method of calculation cross-checked against Class Counsel's lodestar. Class Counsel who recovers a common fund for the benefit of persons other than himself or his client is entitled to a fair and reasonable award of attorneys' fees from the fund as a whole. The Supreme Court confirmed counsels' right to move for an award of attorneys' fees from a common fund in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (prevents inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit).

Here, individual Settlement Class Members will not be required to pay anything for the benefits they receive, as the Class Counsel's attorneys' fees will be subtracted from the total amount of payment available to the class. In considering the ultimate request for a fee award, Class Counsel used the percentage-of-recovery method, which is the favored method in cases

where there is a common fund. *See Schwartz v. TXU Corp.*, 2005 WL 3148350, \*26 (N.D. Tex. Nov. 8, 2005) ("there is a strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery.") The fee Class Counsel will seek at the Fairness Hearing, which, as noted above, will be at most $112,500, amounts to 28% of the total amount of Cash Payments that Woodbolt has agreed to pay to Settlement Class Members, which is on the lower end of the typical range of attorneys' fees in common fund cases in the Fifth Circuit. *Batchelder*, 246 F. Supp. 2d at 533 ("courts typically set the benchmark for attorneys' fees between 25% and 33% of the settlement amount"). In addition, $112,500 is less than 0.3% of the $42 million possible total value of the Savings Vouchers offered in the Settlement. The foregoing analysis of the reasonableness of Class Counsel's fee request does not even consider the value to consumers of the injunctive relief to which Woodbolt has agreed, which is considerable. Because the requested attorneys' fees is well within the acceptable range, it is fair and reasonable, and weighs in favor of preliminary approval of the settlement.

In addition, at the Fairness Hearing, Woodbolt agreed not to oppose an Incentive Payment to each of the Class Representatives of up to $5,000. (Settlement Agreement, § 6.) Given the Class Representatives' respective efforts to advance, and resolve, this litigation, the proposed Incentive Payment is fair and reasonable.

### D. The Proposed Schedule of Events

The Parties propose the a schedule for the Settlement-related events in this case as set forth below. The proposed dates in the right column are respectfully requested and certain dates will be calculated once the date of the Fairness Hearing is set.

| Event | Proposed Due Date/Deadline |
|---|---|
| Deadline for arranging for publication of Class Notice in the earliest possible issues of *Planet Muscle* and *Fitness Rx for Men*. Class Notice will be deemed "transmitted" on the latter of the date the publications above are available to the public. ("Notice Date") | 14 days after Preliminary Approval |
| Deadline for filing of papers in support of final approval of the Settlement, Class Counsel's application for approval of attorneys' fees and costs, and Incentive Award | 14 days Prior to Fairness Hearing |
| Deadline for submitting, claims, exclusion requests or objections | Postmarked within 45 days after Class Notice is transmitted |
| Fairness Hearing | At least 30 days after deadline to opt-out, object or comment on Settlement |

## **CONCLUSION**

For the foregoing reasons, the Parties respectfully request that the Court grant the relief requested herein. A proposed Order is submitted herewith.

Dated: November 1, 2012

Respectfully submitted,

/s/ Robert H. Platt
Robert H. Platt
Attorney-in-Charge
California Bar No. 108533
Admitted to S.D. Texas *Pro Hac Vice*

Bruce B. Kelson
California Bar No. 202441
Admitted to S.D. Texas *Pro Hac Vice*

Adrianne E. Marshack
California Bar No. 253682
Admitted to S.D. Texas *Pro Hac Vice*

MANATT, PHELPS & PHILLIPS, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

Attorneys for Defendant
WOODBOLT DISTRIBUTION, LLC
(erroneously sued as "Woodbolt Distribution, Ltd.")


By: /s/ Gregory B. Scarlett
Gregory B. Scarlett
California Bar No. 131486
Admitted to S.D. Texas (Federal ID No. 1573207)

WASSERMAN, COMDEN, CASSELMAN
   & ESENSTEN, L.L.P.
5567 Reseda Boulevard, Suite 330
Tarzana, California 91357-7033
Telephone:        (818) 705-6800
Facsimile:        (818) 996-8266

Attorneys for Plaintiffs PAMELA GLOVER
and CHARLES ELLIS